THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK JOHNSON, Defendant-Appellant.

First District (2nd Division) No. 85—251

Opinion filed April 22, 1986.

Lawrence Wolf Levin and Steven R. Decker, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Mary Ellen Dienes, and Allan Goldenberg, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and sentenced to 30 years in the Department of Corrections. On appeal defendant argues that (1) he was not proved guilty beyond a reasonable doubt, (2) he was not adequately represented by counsel, and (3) the court erred in admitting into evidence a check purportedly issued to defendant.

On June 2, 1983, at approximately 10 p.m. relatives of 76-year-old Helen Baker went to her house in Chicago, after being informed by a neighbor that Baker had missed an appointment and had not been seen all evening. Donald Cunningham, Baker's brother-in-law, testified at trial that he found Baker lying on the floor of the den, with blood on either side of her body. A Cook County medical examiner later testified at trial that Baker had died from nine stab wounds to her neck, chest and back. Cunningham told the police who arrived at the house that the victim had received both a threatening letter which attempted to extort from her $5,000 and a phone call a month earlier in which the caller said he had sent the letter, that he was holding the son of her next door neighbor, and that the son would be harmed if Baker did not follow the letter's instructions. The letter

was admitted into evidence. Cunningham testified that defendant's family had been neighbors of the victim for almost 15 years. Cunningham also stated at trial that, as executor of the victim's estate, he received from the bank one cancelled check for the month of June. This check was dated June 2, 1983, was made out to defendant for $1,000, and was endorsed "Mark Johnson." Below the endorsement was a number which was the same as defendant's driver's license number in defendant's wallet. He testified that he had opportunities to recognize the victim's signature in the past and that he did not recognize the payor signature on the check as hers. The checkbook was never found.

Refugia Vitella testified that he had been taking care of the victim's lawn since 1979. He came to her home around 10:30 a.m. on June 2, 1983, to cut the lawn but did not see or speak with the victim that morning. Shortly after he arrived, he saw a 20- to 22-year-old man knock on the front door, the door open and the man enter. He never saw the man leave the house. When asked in court to identify the man, he identified one of the jurors. He testified that he viewed four to five individuals in a lineup at the police station on June 3, 1983, and picked out two men.

Detective Tony Maslanka testified that around 11 p.m. he went to the defendant's residence a couple of houses south of the victim's home and spoke with defendant and defendant's family. Defendant told him that he knew that a few months earlier the victim had received a threatening letter which said $6,000 cash should be left in a trash can in the rear of her house. He also reported that a month earlier two men had tried to abduct him while he was walking to a friend's house. He and two friends struggled with the men and got away before he could be dragged into a waiting car. Defendant refused to say who his friends were. The defendant told Maslanka that he had returned home around 4 a.m. on June 2, that he stayed there sleeping all day and that no one else was home.

Detective Joseph Digiacoma testified that when he learned about the extortion and abduction attempts, he asked defendant shortly after midnight if he would go to the police station for further questions. Defendant was not under arrest and agreed to accompany Digiacoma. At the station, defendant said that on June 2 he had come home at about 4 a.m. while his father was getting ready to leave for work. His girlfriend called between 10 and 10:30 a.m. and asked him to take her downtown to classes. Defendant left his house around 11 a.m., arrived at his girlfriend's around noon, and stayed in the Loop until 2 p.m., when he met her again. He returned to his family's

house for dinner. After dinner they shopped. Defendant said he had last seen the victim about 9 p.m. on June 1 when he went to her home to explain that he did not have $200 he owed her. She said not to worry about it and he left. He said he could identify the two men who tried to abduct him, and he began viewing photographs in the photo room. Defendant was cooperative and acted normally.

Detective Peter Dignan testified that the victim's body was lying on a postcard which had a rippled pattern footprint. Dignan also found three sequentially numbered one dollar bills in a bible. At the police station, Dignan spoke with defendant in the presence of other detectives. Defendant said he worked for two Italians who paid him to deliver packages. When Dignan said it was essential to know the identity of the two people who had helped defendant escape abduction, defendant drove with Dignan and two other detectives to a house on East 93rd Street and pointed it out as where his two friends, the two Italians, lived. Defendant was informed that no Italians lived there and defendant did not respond. Defendant signed a consent-to-search form at 4:30 a.m. Defendant's mother let Dignan and another detective into defendant's bedroom, where the officers recovered a wallet with defendant's driver's license, clothing defendant had worn that day, and a pair of gym shoes. The soles of the shoes had a ripple pattern like the print on the postcard and were stained with human blood.

After conducting a lineup for Refugia Vitella to witness, from which Vitella identified defendant as looking like the male he saw coming from the south and entering the victim's home, and identified another person as looking similar, Dignan told defendant he was under arrest for murder and gave him *Miranda* warnings. Defendant said he understood and would answer questions. Confronted with the evidence gathered, defendant confessed at 8:12 a.m. He said he went to the victim's home on June 2 and told the victim he could not repay $200 he had borrowed. She became angry and accused him of trying to extort $5,000 from her. They were in the kitchen and defendant took a steak knife, walked with the victim to the front door, then turned, closed his eyes and began to stab her. He did not remember what he did with the knife. He said he was wearing the gym shoes. Dignan left the room and when he returned, defendant asked him if he would believe a weird story. Defendant said he really did not kill the victim and had gone there to repay her when he found her dead. He said he could prove it and pulled four new, sequentially numbered $100 bills from his sock. Because they were like the $1 bills Dignan had found in the bible, he told defendant the $100 bills had also come

from the victim's house. Defendant responded, "You're right, Detective, I'm sorry." Dignan said that he and another detective were present when assistant State's Attorney Margaret Stanton spoke with defendant after Stanton arrived at the station around 9:30 or 10 a.m.

Stanton testified that she identified herself to defendant and explained that a specific named attorney or someone calling himself that name had called the station. She asked defendant if he was aware of any family member contacting an attorney by that name and he said no. She asked him if he wanted to speak with an attorney by that name and he said no. She was aware that that attorney sometimes practiced criminal law but did not tell defendant this. She advised defendant of his rights and asked if he was willing to talk to her. He said he was. She did not notice anything unusual about defendant's appearance and had no trouble communicating with him. He appeared alert. Defendant repeated what he had told Dignan, adding that the victim told him she was going to inform the police and his parents that she thought he had threatened her with the extortion letter. He also said that he was wearing blue jeans, a blue jeans jacket and some gym shoes, and that he changed clothes at home after the stabbing. Defendant said he took four $100 bills from the victim. He denied phoning her for $5,000.

Expert witnesses for the State testified that a pair of blue jeans, a pair of cut-offs, and socks found in a garbage can behind defendant's home revealed a blood stain on the rear pocket of the blue jeans. The blood stain on the defendant's gym shoe was type O human blood and the victim had type O blood, but no test was taken of defendant's blood. The sole pattern on the postcard had the same pattern as defendant's gym shoes, but no individual characteristics enabled positive identification. A police department documents examiner compared the known signature of the victim with the signature on the June 2 check made out to Mark A. Johnson and stated that the signatures were not made by the same person. He also compared the handwriting of defendant's writing exemplar and defendant's signature on the consent-to-search form, with the endorsement on the check. He found similarities between the writings, but was unable to definitely identify the endorsement as the defendant's writing. He compared the extortion letter with defendant's writing exemplars and opined that the handwriting was the same.

Defendant's father, Eddie Johnson, testified for the defense that defendant's wallet was missing a few days before June 2 and that on the evening of June 2 defendant told him he had found it. Mr. John-

son said he informed the police of an attempted abduction on May 4, 1983, and later told them his son had come home.

Defendant's mother testified that she was told by defendant's girlfriend's mother that the girlfriend was out of town at the time of trial. When police arrived with the consent-to-search form, they said they just needed evidence and that defendant was not under arrest. Defendant called around 9 a.m. and told her he was under arrest. She and her husband called the police station five times and were never allowed to talk to defendant. They went to the station around 10 a.m. She contacted an attorney whose associate said he would put her in touch with defendant's counsel. Defendant's counsel called her after she returned from the police station.

Defendant testified that he was beaten at the police station. He received several blows to the ribs, ears, and head, and nobody but Dignan was present when defendant was being struck. When he first got to the station he was in a detaining room and was told he would look at photographs of known extortionists. He sat there a couple of hours and no one paid any attention to him until he left the room around 2 a.m. to use a pay phone. As he picked up the phone he was told he could not call his parents as he had intended, he was taken to another room, and he was handcuffed to the wall. He did not hear anything for two more hours and then the police asked him where he had been and what he had done. He told them about coming home late, sleeping until his girlfriend called, and then taking her to school. The police told him he way lying and that they were going to get the truth one way or the other. Officer Dignan took out one of his guns, pointed it at him and cocked it. Later, the detectives threw all his clothes on his lap, and told him he had done it because they had found blood all over his clothes and shoes. He was stunned and afraid. When Dignan was alone in the room with him, he told defendant to say that he was part of an extortion plot, that he had closed his eyes and that he had stabbed the victim. Dignan threatened him and told him he had no rights even though he wanted to call home and wanted to speak to a lawyer. However, he did not tell assistant State's Attorney Stanton the story but told her basically what she had testified to.

Defendant testified he went to the victim's house between 9 and 10 a.m. on June 2. There was no gardener. He saw a man parked in front of the house in a red pickup truck, and the man drove away as defendant approached. Defendant saw that the door to the house was cracked and that the door jamb was torn away. He went inside and to the back of the house to a scuffling noise and saw the gardener

kneeling over the victim, stabbing her. The gardener saw defendant, lunged at him with the knife and cut defendant's arm. Defendant ran as Vitella fell to the floor. He never reported seeing Vitella or anyone else stabbing the victim in the house because he was in a daze all day and was scared. He kept the information secret until trial. Defendant denied filling out a $1,000 check to himself or taking $400 from the victim's house. He denied writing the extortion letter and never told the victim he wanted $5,000.

Initially, the State has filed a motion to strike page one of defendant's statement of facts because it is argumentative and conclusional in violation of Supreme Court Rule 341(e)(6) (103 Ill. 2d R. 341(e)(6)). This motion was taken with the case. Since the complained-of portion of defendant's brief contains argument rather than a fair statement of facts, the motion is allowed. See *People v. Omatto* (1980), 88 Ill. App. 3d 438, 439, 410 N.E.2d 588.

Defendant first contends that he was not proved guilty beyond a reasonable doubt. He contends the evidence of his oral statement was coerced and that other circumstantial evidence was so weak that the judgment should be reversed. We disagree, finding there was adequate evidence from which the jury could have determined both that the defendant's statements were freely given and that defendant murdered Helen Baker.

▆▆ ▆ Generally, it is the function of the jury to determine the credibility of the witnesses, and to resolve conflicts in the evidence. (*People v. Reppa* (1982), 104 Ill. App. 3d 1123, 1126, 433 N.E.2d 1091.) That determination will not be disturbed on review unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of defendant's guilt. (*People v. Baker* (1980), 82 Ill. App. 3d 240, 245, 402 N.E.2d 662.) The voluntariness of defendant's statements must be reviewed in light of the entire record to see if defendant's will was overcome when he confessed. (See *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.) The defendant's age, education, the duration of the questioning and whether defendant was given his constitutional rights are facts to be considered in the test for voluntariness. *People v. Holloway* (1985), 131 Ill. App. 3d 290, 307, 475 N.E.2d 915.

▆ Here, the defendant's statement was voluntary. He produced no evidence at trial to corroborate his claim that he was beaten by the police. The assistant State's Attorney, who defendant says did not strike or threaten him, testified that she noticed nothing unusual about defendant's appearance and that he appeared alert and awake.

The jury viewed photographs of defendant taken after his arrest and could determine whether defendant evidenced the severe head and face beating defendant contends he received. The officer who allegedly beat defendant denied ever striking him. The officer testified he advised defendant of his *Miranda* rights and that defendant said he understood these and would answer questions. Although defendant asserts he was told he had no constitutional rights, he does not deny that the assistant State's Attorney advised him of his rights and that he told her he was willing to talk to her. He testified that he did not tell her any story an officer allegedly had threatened he must tell, but that he did confess he stabbed the victim. Defendant was a 20-year-old high school graduate at the time of this occurrence. The record adequately supports finding that defendant's oral statements were voluntary.

Further, the circumstantial evidence at trial supported defendant's statements. The defendant volunteered information regarding the extortion letter and the attempted abduction connected with it. A State documents examiner testified that defendant's handwriting exemplar matched the lettering in the extortion letter. Detective Dignan testified defendant confessed stabbing the victim after she accused him of trying to extort $5,000 from her. The assistant State's Attorney testified defendant told her that the victim said she would tell the police and his parents that he had threatened her with the letter. Thus, a motive was established.

■ Additionally, the defendant does not deny that he was at the victim's home on the morning of June 2. Defendant's shoe with the type O bloodstain had the same sole pattern imprinted on the postcard lying under the victim's body. The signature on the check issued to Mark Johnson on the day of the murder was not the purported maker's signature, but the endorsement was similar to defendant's handwriting. We therefore conclude that the evidence supported finding defendant was guilty of the offense of murder.

■ Defendant next contends that he did not receive adequate representation. To prove that he was denied effective assistance of counsel, defendant must demonstrate that counsel made errors so serious that counsel was not fulfilling the defendant's sixth amendment guarantee, and that the deficient performance deprived defendant of a trial whose result is reliable. (*People v. Mack* (1984), 105 Ill. 2d 103, 129, 473 N.E.2d 880, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Under this test, we do not find that defendant's counsel inadequately represented him.

■ Defendant argues that his counsel's motions to quash arrest

and suppress evidence and statements were never heard prior to trial. Whether to file a motion to quash an arrest or to suppress evidence is a matter of trial strategy. (*People v. Reppa* (1982), 104 Ill. App. 3d 1123, 1126, 433 N.E.2d 1091.) The same can be said of a counsel's decision whether to pursue such motions. A court must "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable representation, and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (*People v. Mack* (1984), 105 Ill. 2d 103, 131, 473 N.E.2d 880.) Defendant has failed to overcome this presumption.

■■ Further, defendant has not demonstrated that counsel's conduct concerning these motions so prejudiced him that, but for the conduct, the result of the trial would have been different. (See *People v. Gaines* (1984), 105 Ill. 2d 79, 93, 473 N.E.2d 868.) Defendant was not under arrest, and probable cause was not necessary when defendant went to the station because he agreed to go to help the investigation of his neighbor's murder. By the time of defendant's arrest and subsequent statements, probable cause had arisen from the evidence of the shoe print, the blood on defendant's shoe, and the gardener's possible identification of defendant. Therefore, a motion to quash the arrest would not have been granted and would not have affected the result of the trial.

Neither is it likely defendant's statements would have been suppressed since, as previously discussed, the evidence supports finding they were given after defendant was read his *Miranda* rights and voluntarily waived those rights. Defendant argues that he did not knowingly waive his rights, however, because his trial lawyer had contacted the police station prior to the interrogation by the assistant State's Attorney. Yet defendant was informed of a call from a lawyer, the assistant State's Attorney actually questioned defendant whether a family member might have arranged for a lawyer, thereby suggesting to him that he might not recognize the name, and the assistant State's Attorney asked defendant if he wanted to speak with an attorney by that name. Offered these opportunities to speak with a specific lawyer who had called on his behalf, defendant knowingly waived his right to consult with counsel and expressed his willingness to talk with the assistant State's Attorney. This situation is inapposite to those cited by defendant where police, prior to or during custodial interrogation, refuse an attorney access to the suspect or fail to inform the suspect that an attorney is present and seeking to consult with him. (*People v. Smith* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325, *cert.*

*denied* (1983), 461 U.S. 937, 77 L. Ed. 2d 312, 103 S. Ct. 2107.) Here, in light of the attention the assistant State's Attorney gave to insuring defendant was informed of his *Miranda* rights and of the lawyer's call, his responses and conduct evinced a deliberate, knowing choice to speak without consulting an attorney.

On appeal, defendant suggests that he was not fully informed of the lawyer's phone call. In the July 24, 1984, motion to quash arrest and suppress physical evidence and statements, trial counsel alleged that he informed the police in the phone call that "he wished to be present at any interrogation." The record does not reflect when defendant's counsel called, whom he spoke with or what was said, if anything, about him being present for questioning.

■■ ■ Defendant seeks a hearing on the facts surrounding the attorney's phone call. A post-conviction petitioner is only entitled to an evidentiary hearing upon a substantial showing, supported by the record, of a violation of constitutional rights. (*People v. Gaines* (1984), 105 Ill. 2d 79, 91, 473 N.E.2d 868.) Here, the focus must be on the effect of failure of police to inform defendant of an attorney's wish to be present for questioning, on the knowingness and voluntariness of defendant's waiver. The United States Supreme Court has recently noted that the Constitution does not require police to supply a suspect with a "flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." (*Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1142.) The court ruled that events unknown to a suspect cannot affect a waiver made voluntarily and with full awareness of the right being abandoned. (475 U.S. ___, ___, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1142.) In view of the detailed information the instant defendant was actually given concerning the lawyer's phone call, we find that failing to tell him a lawyer wanted to be present for questioning did not violate his constitutional rights.

Defendant also urges that he was inadequately represented because counsel did not seek to suppress Vitella's identification testimony and because counsel filed no subpoenas or motion for discovery. Given that Vitella chose two men from the lineup, however, and later failed to identify defendant in court, defendant's counsel may have decided as a matter of strategy that the identification testimony would undermine the State's case. Neither is there merit in defendant's argument that his girlfriend was never called as a witness. The record indicates that defendant's mother attempted to contact her, but was told that she was out of town during the trial. Finally, even though trial counsel filed no motion for discovery, he had access to all

discoverable materials before trial because the State filed its answers to discovery.

 Lastly, defendant alleges that the trial court erred in admitting into evidence the June 2, 1983, check made payable to defendant. Defendant asserts the endorsement on the check was not proved to be defendant's and that the check was inadmissible because he was never charged with theft or forgery. Neither argument is persuasive.

The executor of the victim's estate received the check in the bank's routine monthly statement. The check was dated the day of the murder, was made out to defendant, and had on its back defendant's name and driver's license number. Defendant testified he had not given his license to anyone and he had his license when he was arrested. A documents examiner found that the victim's signature as maker of the check was different from her known signature and that there were similarities between the defendant's handwriting exemplar and the endorsement on the back of the check. Thus, there was sufficient circumstantial evidence to support a finding that defendant had endorsed the check, and the check was properly admitted. See *People v. Gray* (1981), 99 Ill. App. 3d 851, 426 N.E.2d 290; *People v. Munoz* (1979), 70 Ill. App. 3d 76, 388 N.E.2d 133.

 The check was also admissible as relevant to defendant's motive for the murder because it supports the theory that defendant wanted money from the victim, even by extortion. Evidence which shows motive is admissible, even if it shows that the accused has committed a crime other than the one for which he is tried. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.) A reviewing court will not disturb the trial court's decision to admit such evidence absent an abuse of discretion. (*People v. Anderson* (1982), 108 Ill. App. 3d 563, 439 N.E.2d 65.) No abuse was displayed here.

We affirm.

Affirmed.

BILANDIC, P.J., and HARTMAN, J., concur.