THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EUGENE THURMAN, Defendant-Appellant.

First District (1st Division) No. 86—0958

Opinion filed May 9, 1988.—Rehearing denied June 7, 1988.

Lawrence Wolf Levin and Glenn Seiden & Associates, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Kathleen A. Bom, and Patricia Y. Brown, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

Defendant, Eugene Thurman, was charged with two counts of murder and one count of armed violence involving Robert Redmond and one count of attempted murder, three counts of aggravated battery and two counts of armed violence regarding Lee Wells. Following a bench trial, he was found not guilty of the murder of Robert Redmond, guilty of the attempted murder of Lee Wells and sentenced to eight years' imprisonment.

On appeal he argues that he was not proven guilty beyond a reasonable doubt; that he was denied a fair trial due to ineffective assistance of counsel; that he was denied a fair trial due to the bias of the trial judge; and that the verdicts are legally inconsistent. We affirm the decision of the trial court.

The facts leading up to defendant's conviction are as follows. On June 18, 1983, Robert Redmond was killed and Lee Wells was shot three times. On October 19, 1983, the defendant was arrested and charged with murder and attempted murder.

At trial Eugene Brown testified that he lived at 1852 Kildare in Chicago and that at 4:49 in the morning on June 18, 1983, he was sitting on his couch in his living room talking to his son, Lawrence Brown. He heard some shots outside and some loud talking and approximately three minutes later heard someone cry, "Please don't hurt me any more. You done hurt me enough." After hearing six shots, he looked out and saw two men in front of the house at 1848 Kildare Street. One man was holding a large bag and the defendant was holding a gun.

Mr. Brown said he saw the defendant fire three shots at the man holding the bag, the third one hitting the victim, Robert Redmond, in the head and splattering his brains on the ground. Mr. Brown estimated that he was approximately 30 to 40 feet away from the scene of the shooting and that the defendant was approximately five feet away from Redmond when he shot him. It was light outside at the time and Mr. Brown had an unobstructed view of the defendant's face.

After the shooting he saw the defendant run south towards 19th Street. He went inside to get his camera, but could not take photographs because he did not have any film. Robert Redmond was lying on the ground dead, and when the police arrived, Mr. Brown saw

them pull Lee Wells from underneath a car at 1848 Kildare. Mr. Wells was bleeding badly and appeared to be unconscious. The bag that had been held by Robert Redmond was found to contain soap, spray starch and fabric softener.

On October 19, 1983, Mr. Brown viewed a lineup at the police station at Harrison and Kedzie. He identified the defendant as the man who had shot Robert Redmond on June 18, 1983, and also identified him from a photograph.

On cross-examination he testified that on the day of the incident he had told the police his name was Gino Cappalino because he did not want to get involved. He told the authorities that he had never seen the defendant before and that the defendant was wearing a dark brown shirt and pants and "Jheri Kurls" but could not remember his general description. He did not tell the police that he had witnessed the occurrence until months later. Mr. Brown also admitted that he had told the defendant's investigator that at the time of the incident he was in Mississippi and that he only learned of the shooting when he returned, but denied telling him that he told the police his name was Cappalino. He also stated that he had seen the defendant three or four times before when the defendant was visiting his landlord.

Sherman Randall, the defendant's investigator, by way of stipulation, testified that on October 9, 1984, he had gone to Eugene Brown's home and that Brown told him that he had never told the police his name was Gino Cappalino.

Lee Wells testified that on June 18, 1983, in the early morning hours he was with his friend Robert Redmond. They were walking down the 4300 block of Cermak Avenue when they noticed a broken store window with products lying around. Before picking the products up, he went across the street and spoke to a person sitting on the front porch. He returned to his friend, they picked up some laundry soap, fabric softener and starch, put them in a bag and proceeded towards 18th and Kildare Streets. As they were walking, he heard someone ask Robert Redmond for a cigarette. He then heard two or three shots, turned and saw Robert Redmond on the ground approximately seven feet away from him and the defendant standing with a gun. Wells started to back away from the defendant when the defendant began to shoot at him. Wells dove under a car yelling, "Don't shoot me anymore," but the defendant shot him twice more. He was shot in the thigh, groin and lower stomach.

On October 19, 1983, he went to Area 4 Violent Crimes Headquarters where he selected a photograph of the defendant as the man who shot him. He also viewed a lineup and identified the defendant as

the man who shot him. He identified the defendant in court and stated that he had "Jheri Kurls" at the time of the shooting.

Wells denied telling Officers Wendt and Corneliuson on June 22, 1983, that it was the man across the street on the porch who had come over and shot him or that he had told Officers Godboldt and Johnson on June 27, 1983, that he was standing on the street talking to Redmond when a man approached and shot him. He further denied telling Sherman Randall, the defendant's investigator, that although he had picked the defendant's photograph it was possible that he was mistaken or that one of the people in a group photograph labeled defendant's exhibits No. 1 and No. 2 was the one who shot him. He stated that the man who had shot him had "Jheri Kurls," heavy sideburns, a moustache and a light beard, but that he had never told the police the man wore glasses.

At the time of trial Wells was serving a four-year sentence for a robbery he had committed in 1985 and had been convicted of rape in 1979.

The parties stipulated that if Officer Godboldt were to testify, he would say that Lee Wells told him that it was the man across the street on the porch that had shot him. Sherman Randall would testify that when Wells identified a photograph of the defendant, he stated that it was possible that he could be mistaken.

Officer Maureen Doyle of the Chicago police department testified that she and her partner, Patrick O'Connell, responded to a call that a man had been shot at 1848 South Kildare. Upon arriving, they found Robert Redmond, who had been shot in the head, lying on the sidewalk and Lee Wells, lying on the street between two parked cars. Officer Doyle interviewed a man who said his name was Gino Cappalino and who stated he had called the police. He told her that the offender was wearing "Jheri Kurls" but did not say that he had ever seen him before.

Officer Doyle picked up a calculator, soap and spray starch which were lying on the sidewalk approximately five feet from Redmond and proceeded to the scene of a reported burglary at the Look-in Shop at 4317 Cermak Road, approximately six blocks from the scene of the shooting. At the store a woman who identified herself as Mrs. Thurman verified that the items in question were sold in the store and the property was given to her by the officer.

Assistant State's Attorney Gerald Nora testified that on October 19, 1983, he was assigned to the felony review unit and arrived at the Area 4 Violent Crimes Headquarters at approximately 7:10 a.m. He read the defendant his *Miranda* warnings and asked him about the

shooting on June 18, 1983. The defendant stated that he did not know anything about the shooting and did not have anything to say about it. He said a person named "T" had notified him about the burglary at his store and after he determined what was missing, he took his car, a blue Nova, and went looking for people who may have been involved in the burglary. The defendant further said he stopped two men who told him they had nothing to do with the burglary and even if they had, he would not have shot them but would have just whipped them. Defendant then returned to the store.

The parties stipulated that if Deputy Medical Examiner Edmond Donneghue was called, he would testify that he had performed a post-mortem on Robert Redmond on June 22, 1983, and that in his opinion Robert Redmond died as a result of multiple gunshot wounds received in the shoulder and the head on June 18, 1983, at 4:49 a.m.

Howard Crowell testified for the defense that at approximately 4:40 to 4:50 a.m. on June 18, 1983, he was in the front portion of his home on the second floor of 1821 South Kildare. He heard talking and then gunshots and got out of his bed and looked out of the window. When he looked out, he saw two men lying on the ground, one behind a car and one near the front of the automobile, but did not see anyone else.

James Smith testified that on June 18, 1983, he lived at 1850 South Kildare. In the early morning hours he was awakened by a loud voice and then heard gunshots.

The parties stipulated that if Officers Corneliuson and Godboldt were called they would testify that other than the fact that one witness had told them that the offender left in a grey car, nothing in their reports connected the defendant to a grey car.

Dorothy Thurman testified that she had been married to the defendant for 15 years. In June 1983 they lived at 4138 West Cermak and operated the Look-In Grocery Store located at 4317 West Cermak. On June 18, 1983, she was awakened in the early morning when Lilly Shaw and "T" came to her door. They told her there had been a burglary at her store and she told her husband. She dressed and walked to the store while her husband drove to the store in his blue Nova. She arrived at the store at sunup and her husband and the police arrived at the store at approximately 4:50 a.m. She stayed at the store for several hours. The defendant stayed for approximately an hour and then left for about 30 minutes. She further stated that her husband had never driven a grey car.

Mrs. Thurman denied telling officers Mesa and Selleck that she had discovered that her store had been burglarized when she arrived

to open it up. She further denied telling Detectives Wendt and Corneliuson on June 22, 1983, that she had become aware of the burglary when she had come to open the store up or that people claiming to be relatives of Robert Redmond had come into the store looking for her husband. Mrs. Thurman did not recall having a conversation with Assistant State's Attorney Gerald Nora in which she told him that on the night of the burglary a boy had come to the house to tell them that the store had been broken into and that her husband left the house before she did. She stated that she did not tell him that they both went to the store on foot or that they arrived at the store at the same time. Finally, she denied telling Detective Goodwin on July 13, 1983, that she discovered that her store had been burglarized when she went to open it up.

The parties stipulated on rebuttal that if Mr. Nora were called, he would testify that on October 19, 1983, he spoke to Mrs. Thurman on the phone and she told him that on the morning of June 18, 1983, a boy came by the house and told her that the store had been broken into, her husband left the house before she did through the front door and she went out the back door and that both of them went on foot and arrived at the store at the same time.

It was further stipulated that if Officer Mesa were called to testify, he would state that on June 18, 1983, Mrs. Thurman told him that when she arrived at the store she discovered it had been burglarized. If Officers Wendt and Corneliuson were called, they would testify that on June 22, 1983, Mrs. Thurman told them that she became aware of the burglary when she went to the store in the morning.

Defendant's first argument is that he was not proven guilty of attempted murder beyond a reasonable doubt. Defendant contends that the main issue is that of identification, and since the State's two main witnesses were not credible, their identification was unreliable and their testimony was insufficient to prove his guilt beyond a reasonable doubt.

Where identification of the accused is at issue, the testimony of a single witness is sufficient to support a conviction provided the witness is credible and viewed the defendant under circumstances which would permit a positive identification. (*People v. Thomas* (1986), 145 Ill. App. 3d 1, 7-8, 495 N.E.2d 639.) The standard for positive identification is whether the witness was close enough to the accused for a sufficient length of time under conditions that provided adequate opportunity to view the offender at the time of the crime. (*People v. Williams* (1986), 143 Ill. App. 3d 658, 662, 493 N.E.2d 362.) A trial court sitting without a jury must determine the credibility of the wit-

nesses and the weight to be given their testimony, and its findings should not be reversed on review unless the evidence is so unreasonable, improbable or unsatisfactory as to leave reasonable doubt of defendant's guilt. (*In re Santiago* (1980), 87 Ill. App. 3d 605, 608, 410 N.E.2d 143.) Any conflicts or discrepancies in the testimony do not destroy its credibility, but rather affect the weight to be accorded to the testimony by the trier of fact. In the present case while the witnesses' description of the sequence of events may not be identical, their stories corroborate each other in material parts. Both witnesses place the defendant at the scene of the shooting with a gun. Lee Wells testified that the defendant shot at him without provocation while he pleaded with him to stop. Eugene Brown testified that he heard someone yell, "Please don't hurt me anymore. You done hurt me enough." Brown testified that he heard a total of six shots; Wells testified that he heard two or three shots and then was shot three times himself, for a total of five or six shots. Brown also stated that when the police arrived he saw them pull Wells bleeding and unconscious from under a car. The defendant was identified by both witnesses in a lineup and in court, and, additionally, the defendant's photograph was picked out of an array by Lee Wells while in the hospital. If this evidence is believed, it is clearly sufficient to establish the identity of the assailant. In a situation in which the credibility of all of the witnesses has been impeached, the judgment of the trial judge who had the opportunity to observe the demeanor of the witnesses and weigh their credibility will not be disturbed.

Second, defendant maintains that he was denied a fair trial due to ineffective assistance of counsel. He claims that his attorney was incompetent because he: (1) failed to present a motion to quash the defendant's arrest; (2) failed to present a motion to suppress his statements; (3) failed to present a motion to suppress the identification testimony; and (4) failed to interview and prepare witnesses.

 The test for effective assistance of counsel has two prongs: first, the defendant must show that counsel's performance was inadequate, and second, he must show that he was prejudiced as a result of counsel's incompetence and thus was deprived of a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246.) It is not enough for defendant to show that counsel's errors had some conceivable effect on the outcome of the trial; to meet this test the defendant must show that there is reasonable probability that, but for counsel's unprofessional errors, the result would have been different. (*People v. Tyson* (1985), 137 Ill. App. 3d 912, 920,

485 N.E.2d 523.) In assessing trial counsel's performance, the reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable representation and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. (*People v. Mack* (1984), 105 Ill. 2d 103, 131, 473 N.E.2d 880.) Counsel's incompetence is to be determined from a consideration of a totality of counsel's conduct, not isolated incidents, and a reviewing court will not extend its inquiry into areas involving the exercise of judgment, discretion, trial tactics or strategy. (*People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 1026, 486 N.E.2d 1297.) However, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. (*People v. Albanese* (1984), 104 Ill. 2d 504, 527, 473 N.E.2d 1246.) If it is easier to dispose of an ineffective assistance of counsel claim on lack of sufficient prejudice, that course should be followed. *People v. Taylor* (1986), 146 Ill. App. 3d 45, 53, 495 N.E.2d 263.

■ Assuming, *arguendo*, that the motions to suppress would have been granted and defense counsel had rehabilitated Mrs. Thurman, we do not believe the outcome of the trial would have been different. The evidence identifying the defendant as the assailant was sufficient to establish his guilt beyond a reasonable doubt. Viewing the record as a whole, we do not believe that the defendant has established that defense counsel was actually incompetent and that this incompetence substantially prejudiced the defendant so that the outcome of the trial was probably changed.

Next, the defendant argues that the findings were legally inconsistent and, therefore, cannot stand. He maintains that although there were two separate indictments for the shooting of two different people, the shootings should not be viewed separately, but in their entirety, as one act. He contends that since the same person shot both victims, if he did not have the requisite intent to kill Robert Redmond, then he could not have had the requisite intent to kill Lee Wells. At trial the State took the converse position, arguing that if the same person shot both victims he must be guilty of both crimes. Both arguments were rejected by the trial court on the basis that the defendant's intent towards the victims could have been different, and while he may have intentionally and without justification sought to kill Lee Wells, that did not necessarily mean that he intentionally and without justification sought to kill Robert Redmond.

■ ■ Legally inconsistent verdicts cannot stand, and when le-

gally inconsistent verdicts of guilty are returned, a reversal and a new trial on all counts must follow. (*People v. Frias* (1983), 99 Ill. 2d 193, 457 N.E.2d 1233; *People v. Coleman* (1985), 131 Ill. App. 3d 76, 80.) Verdicts are legally inconsistent where both crimes arise out of the same set of facts and when they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist. (*People v. Rogers* (1982), 104 Ill. App. 3d 326, 329, 423 N.E.2d 975.) In the present case, contrary to the defendant's contentions, both crimes did not arise out of the same facts. Although the shootings took place within minutes of each other, they were not simultaneous. The defendant first shot one victim and then the other; he did not shoot at both victims at the same time. Based on these facts, it was not legally inconsistent for the trier of fact to find that the defendant had the requisite intent to kill Lee Wells, but not to kill Robert Redmond.

 Finally, defendant claims that he was denied a fair trial because the trial judge had a "preconceived belief" as to his guilt. We note that this issue was not raised in the defendant's post-trial motion. Generally, when an issue is not raised in the written motion for a new trial that issue is waived and cannot be urged as a grounds for reversal or review. (*People v. Caballero* (1984), 102 Ill. 2d 23, 31, 46 N.E.2d 223.) The waiver doctrine is qualified, however, by the plain error doctrine as embodied in Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)), the purpose of which is to correct any serious injustices which have been done to the defendant. When the evidence is so close that there is a possibility that an innocent man may have been convicted due to some error which is obvious from the record, or the alleged error deprived the accused of substantial means of enjoying a fair and impartial trial, but has not been properly preserved, the court may take notice of the errors. (*People v. Collins* (1984), 127 Ill. App. 3d 236, 240, 468 N.E.2d 1343.) Before plain error can be considered as a means of circumventing the general waiver rule, it must be clear from the record that the substantive rights of the defendant had been affected. *People v. Coles* (1979), 74 Ill. 2d 393, 397, 385 N.E.2d 694.

 An examination of the record indicates that this is not a situation to which the plain error exception applies. The trial was fairly conducted and there is ample evidence upon which to base the defendant's conviction. Even were we to apply the plain error exception, we do not believe that the comments made by the court that during trial the court gauged, as it said it does in every case, a fair sentence, demonstrated a "preconceived belief" on the part of the judge as to the defendant's guilt. For comments made by the court to

constitute reversible error the defendant must show that he has been harmed by the remarks of the judge. (*People v. Wells* (1982), 106 Ill. App. 3d 1077, 1086, 436 N.E.2d 688.) The court's comments should not be read as isolated statements but should be considered in the context in which they were made. (*People v. Castillon* (1971), 132 Ill. App. 2d 581, 585, 270 N.E.2d 268.) In the present case, the judge merely commented on the fairness of the trial and the overwhelming evidence against the defendant before stating that he had attempted to gauge a fair sentence during the trial if the defendant was found guilty. Thereafter, the trial court found the defendant not guilty of murder and imposed an almost minimum sentence for the attempted murder. Since these facts refute any allegation of prejudice on the part of the court, we find the defendant's last argument also to be without merit.

Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

QUINLAN and O'CONNOR, JJ., concur.