THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BUDDY UNDERWOOD *et al.*, Defendants-Appellants.

First District (6th Division)   Nos. 1—92—2584, 1—92—2585 cons.

Opinion filed May 13, 1994.

Rita Fry, Public Defender, of Chicago (Lynne Hubanks Miller, Assistant Public Defender, of counsel), for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Elizabeth A. Scholz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

After a bench trial, the defendants, brothers Buddy and George Underwood, were convicted of armed robbery. The trial judge sentenced Buddy to the Illinois Department of Corrections for 10 years and George to the Illinois Department of Corrections for 18 years. We consolidated their appeals. They contest the sufficiency of the evidence against them and the effectiveness of their counsel.

Buddy and George were tried jointly for the armed robbery of James Bryant. Bryant testified that on November 5, 1991, he was using a pay phone at the bus stop at 16th Street and Kedzie Avenue in Chicago. It was dark outside, but there were working streetlights lighting the area. As Bryant was hanging up the phone, he felt an arm "coming around" the right side of his neck. He looked at the arm and saw that the hand by his neck held a box cutter with a

"push out" razor blade. The man holding Bryant said, "This is a stick-up."

The man turned Bryant, and Bryant looked at him. The man was wearing red sweat pants and a black jacket. Bryant told the police the man was wearing a red skullcap. Bryant saw the box cutter "up close" when he was turned; the man held the box cutter razor to Bryant's throat. In court, Bryant identified George as the man who held him. Also, he identified a State exhibit as the box cutter "that was at [his] throat."

While George was holding Bryant, another man walked to the left side of Bryant. This man also had a box cutter. In court, Bryant identified Buddy as the second man. Bryant had never seen Buddy and George before November 5. Buddy was wearing a leather jacket with a "fur collar around it" and a skullcap. Buddy placed his box cutter against Bryant's throat, and George said "Let's drag him in the alley." George and Buddy pulled Bryant approximately 10 feet into an alley, where they were met by another man. The third man was holding a gun, and he "put the pistol to [Bryant's] head."

George then repeated his statement about "a stick-up." Buddy reached into Bryant's pants pocket and removed $15. George reached into Bryant's coat pocket and removed $355 and a CTA pass. Buddy and George then left the alley, traveling east on 16th Street. The third man held Bryant at gunpoint for approximately 10 seconds, then ran. He was never apprehended.

Bryant returned to the bus stop, where he saw an unmarked police car. He got into the car, told the officers about the robbery and gave the officers the same description of Buddy and George's clothing that he gave in court. The officers called his description of Buddy and George over the police radio. They drove Bryant around the area for a short period of time and then drove him to Holman Avenue and Douglas Boulevard, where they parked near another police car.

At Douglas and Holman, Bryant saw Buddy and George standing beside the second police car. Bryant was asked if the two men "were the ones that robbed [him]" and he replied that they were. Bryant noticed that George had "the red sweat pants on under [a pair of] black pants."

It was approximately 10:35 p.m. when Bryant "was assaulted" by the three men. The robbery lasted approximately five minutes and another five minutes passed from the time "the defendants held box cutters on [him] until the time [he] saw them" standing beside the police car at Douglas and Holman.

Officer Gaal testified that he was in an unmarked police car on November 5, 1991, when he heard the description of Buddy and

George over his radio. "Just a couple of minutes" later, at approximately 10:45 p.m., he saw two men running across Douglas. One man was wearing a blue skullcap; the other wore a red skullcap. Gaal stopped the two men because they "matched the description that was over the air." When the other officers and Bryant arrived, Gaal asked Bryant if he "recognized anybody." Bryant told Gaal that "those [were] the guys that had just robbed him in the alley." Gaal identified Buddy and George in court as the two men he stopped.

After Bryant identified Buddy and George, Gaal searched them. George was wearing a black pair of pants over red jogging pants. Gaal did not find the missing $370 or CTA pass. He found a chrome box cutter in Buddy's pocket. He did not recover another box cutter from either George or Buddy. In his arrest reports for Buddy and George, however, Gaal noted that he recovered a box cutter from George, but no weapon from Buddy. He identified the State exhibit as the box cutter he recovered.

The defendants called three relatives in support of their alibi. Their mother, Eula Wilkerson, testified that she left her house with Buddy and George at 7 p.m. on November 5, 1991. Buddy was wearing a long leather jacket and a skullcap. George wore red jogging pants beneath blue or black jeans and a leather jacket. Wilkerson did not see her sons with box cutters. They drove to Bertha Williams' house. Williams lived at Trumbull and 14th Streets. At Williams' house, Wilkerson played cards with her daughter Ella Underwood, Lillie Sutton, Buddy, and George. Buddy and George left Williams' home at approximately 10:15 p.m. because they wanted to visit their niece, Fornita Underwood, who lived with Ella near Douglas and Holman. Wilkerson explained that this was 1 1/2 blocks from Williams' house. At approximately 10:30 p.m., Wilkerson's granddaughter ran to Williams' home from Ella and Fornita's house and told Wilkerson that George and Buddy had been arrested.

Ella was playing cards at Williams' house with Wilkerson, Sutton, Buddy, and George on the evening of November 5, 1991. George and Buddy left Williams' house "somewhere after 10:30—10:15, something like that" to visit Fornita. Ella testified that the distance from her house to the bus stop at Kedzie and 16th where Bryant was robbed is approximately six total blocks, four blocks west and two blocks north.

Fornita testified that Buddy and George were arrested in front of her house at approximately 10:30 p.m. on November 5, 1991. Earlier, at approximately 10:10 p.m., George called Fornita and told her that he and Buddy were "coming over" to visit her. Fornita testified that the distance from her house to Kedzie and 16th is approximately six blocks.

Buddy and George testified in their own defense. The parties stipulated that George had been convicted of robbery and aggravated battery and that Buddy had been convicted of possession of a stolen motor vehicle. Buddy testified that he played cards at Williams' house on November 5, 1991. He heard George call Fornita. At 10:30 p.m., he and George left Williams' home and began walking to Fornita's house. Neither he nor George had a box cutter. Buddy was wearing a long leather coat with a fur collar and a blue skullcap. George was wearing blue jeans, a leather coat and a red cap.

As the brothers crossed Douglas Boulevard, they tried to "beat traffic across the street through the park." A police car drove toward them, and the police exited the car and asked Buddy and George to stop. When the police stopped Buddy and George, Buddy believed it was because they had tried to "beat traffic." Buddy admitted that after his arrest he did not tell a detective he was trying to beat traffic, but told the detective he ran across the street and park because it was cold outside. The police searched them but did not recover anything from either brother.

Another police car arrived and stopped approximately 40 feet from the brothers. Buddy described the lighting as "dark." From inside the car, Bryant looked at Buddy and George for "just a second or two" and said "I'm not sure but it looks like them." Buddy could hear Bryant despite the 40-foot distance between Bryant and Buddy. The defendants were never placed in a lineup and were not asked to speak or turn for Bryant.

George testified that he played cards at Williams' house on November 5, 1991. He called Fornita to ask if he and Buddy could visit. According to George, he and Buddy left Williams' house at approximately 10:45 p.m. and began walking to Fornita's house. They ran across the street and through traffic. Then, "the police come up behind us and jumped out of the car with guns in their hands and told us to stop, so we stopped." The police searched Buddy and George but did not find any money or weapons.

Another police car arrived and the officers who stopped Buddy and George "had [them] come up close to the car." George and Buddy stood approximately 20 feet from the car. George saw that the back window of the car was open and heard the officers ask a man behind the window if Buddy and George "were the guys who robbed him." The man in the back seat said, "No, it looks like them but I'm not for sure." The first time George saw the box cutter was in court on the day of trial.

The trial judge found Bryant to be very credible. She explained that Bryant "testified in a very clear and forthright manner that the

two defendants before the court are the people who approached him on November 5." She noted the "degree of certainty" Bryant had regarding the identity of Buddy and George and the strong similarity between the description of the brothers' clothing Bryant gave to the police and the clothing the brothers admitted wearing on November 5. She recognized the possibility of a suggestive identification based on the way Bryant viewed Buddy and George after their arrest, but found that Bryant had a sufficient independent opportunity to observe the defendants while they were robbing him. Also, the trial judge explained that demeanor "was an important issue here" and noted that Buddy's demeanor "changed significantly when he was asked questions about whether or not a box cutter was recovered." The judge stated that none of the alibi testimony covered the "time in which the crime occurred" and that "the defendants were on the street during a certain amount of time where none of these witnesses had an opportunity to see where they were." She found both Buddy and George guilty of armed robbery.

The defendants argue that their convictions should be reversed because the evidence was insufficient to support the trial judge's finding of guilt in five separate ways. We must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *People v. Schott* (1991), 145 Ill. 2d 188, 199-200, 203, 582 N.E.2d 690.

We note that "[t]he credibility of the complainant is an issue best determined by the trier of fact, who heard the testimony and observed the demeanor of the witnesses; [thus, a] trier of fact's determination as to the credibility of the witness is to be accorded great weight." (*People v. Puhl* (1991), 211 Ill. App. 3d 457, 468, 570 N.E.2d 447.) Moreover, "[i]t is well established that the testimony of one witness, if credible and positive, will sustain a conviction even though it is contradicted by the accused." *People v. Goodum* (1984), 127 Ill. App. 3d 350, 353, 468 N.E.2d 1237; see also *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.

Buddy and George first claim that the method used by the police to allow Bryant to view them was impermissibly suggestive. They contend that the in-court identifications made by Bryant were improperly based solely on his view of the defendants at Douglas and Holman, and thus may not be considered as evidence against them. While we agree with the trial judge's assessment of that procedure as possibly suggestive, we also agree with her decision that Bryant had a sufficient independent opportunity to observe Buddy and George before seeing them in police custody.

■ Despite an impermissibly suggestive police procedure, an in-court identification by "the identifying witness w[ill] still be admissible so long as the record clearly reveal[s] that the witness' prior observation of the defendant was sufficient to serve as an independent basis for his in-court identification." (*People v. Sanders* (1972), 5 Ill. App. 3d 89, 93, 282 N.E.2d 742.) Bryant explained that the robbery site was well-lit and that he made a point of viewing George. Further, Bryant and Gaal both testified that Bryant unequivocally identified Buddy and George as the men who robbed him. The only evidence to the contrary was Buddy and George's assertions that they could hear what Bryant said inside a car between 20 and 40 feet from them. The trial judge did not have to believe this testimony. (*People v. Rhodes* (1981), 85 Ill. 2d 241, 249, 422 N.E.2d 605.) In fact, the trial judge explicitly found that Bryant clearly identified Buddy and George and that he had a sufficient independent opportunity to observe the defendants during the five-minute robbery. Accordingly, we hold that the possibly suggestive procedure here does not require reversal.

■ Next, George and Buddy assert that the box cutter was not sufficiently proved to be the weapon used against Bryant. We hold that the defendants have waived this issue. In violation of Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)), they fail to cite a single case dealing with the identification of a crime weapon or any other evidence. Additionally, at trial Buddy and George made no attempt to question Bryant about his belief that the State's exhibit was the box cutter used against him. Further, they did not object either to Gaal's testimony establishing a chain of custody or to the exhibit's admission into evidence. See *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331.

Moreover, we reject this contention on the merits. Bryant stated, without hesitation, that the State's exhibit was a box cutter held against his neck by one of the defendants. The trial judge made an explicit determination that Bryant was credible and unimpeached and that Buddy, when discussing the box cutter, was not credible. We refuse the defendants' invitation to assess the credibility of witnesses on appeal and leave this determination to the trial judge. See *People v. Collins* (1985), 106 Ill. 237, 261, 478 N.E.2d 267; *Puhl*, 211 Ill. App. 3d at 468; *People v. Thurman* (1988), 169 Ill. App. 3d 996, 1003-04, 523 N.E.2d 1184.

■ Additionally, Buddy and George assert that the arrest reports written by Gaal "completely" impeach his testimony that a box cutter was recovered from the defendants. First, we reject the State's contention that we may not consider these reports, which were made

part of the common law record on appeal. (See 134 Ill. 2d R. 321; *In re Estate of Goodlett* (1992), 225 Ill. App. 3d 581, 588, 588 N.E.2d 367.) We agree that Gaal's testimony that he recovered the box cutter from Buddy, and not from George, differs from his arrest report statements that he recovered the box cutter from George, and not from Buddy.

Nonetheless, this contention is based on yet another credibility determination that we believe should be left to the trial judge. (*Collins*, 106 Ill. 2d at 261; *Thurman*, 169 Ill. App. 3d at 1003-04.) The judge was free to believe that Gaal accidentally switched the names at trial or on the reports. Further, Gaal never varied in his testimony about the key fact that a box cutter used against Bryant was recovered from one of the brothers. The judge stated that, based on Buddy's demeanor, she did not believe his assertions that he did not have a box cutter and that the police did not find a box cutter on him. We will not reverse this credibility determination.

■ George and Buddy also contend that the evidence was insufficient to support their convictions because the clothes they were wearing on November 5, 1991, were not admitted into evidence. Nonetheless, the defendants have never disputed that Bryant's description of their clothes matched the clothing they were actually wearing on November 5. Thus, they cannot explain how the failure to admit the clothing into evidence affected the sufficiency of the evidence against them. Moreover, they baldly assert that the State had possession of this clothing, although there is no support in the record for that statement. Finally, the record demonstrates that Bryant's in-court identification of Buddy and George was not based on what clothes they wore on November 5, but on his memory of them from the five-minute robbery in a lighted area. Circumstantial evidence and a positive identification are sufficient to sustain an armed robbery conviction even if the proceeds of the robbery and the clothing used to initially identify the defendants are not admitted into evidence. *Goodum*, 127 Ill. App. 3d at 354.

■ Finally, Buddy and George assert that the evidence is insufficient to show their guilt because it was not physically possible for the defendants to rob Bryant for five minutes beginning at 10:35 at the bus stop, and then be in front of Ella's house, six blocks away, at 10:45, the time Gaal testified he first saw them. We hold that the trial judge's determination of this question of fact was supported by the evidence. The evidence, viewed in the light most favorable to the prosecution, supports the inference that the two young men could have traveled the distance from the crime scene to their arrest scene in approximately five minutes.

■ Accordingly, we reject all five contentions regarding the sufficiency of the evidence against Buddy and George. The only testimony that raises a question about the defendants' guilt came from Buddy and George, two convicted felons who contradicted each other on several points. Leaving the question of credibility to the trial judge, and construing all the other evidence in the light most favorable to the prosecution, we hold that Buddy's and George's convictions are well supported by the evidence. See *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317; *Goodum*, 127 Ill. App. 3d at 353-54.

Buddy and George additionally argue that they received ineffective assistance from their trial counsel. At trial, Buddy and George were represented by the same assistant public defender. To establish ineffective assistance of counsel warranting reversal of a conviction, Buddy and George must show both "that the advice of counsel fell outside the range of competence demanded of attorneys in criminal cases and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*People v. Barrow* (1989), 133 Ill. 2d 226, 247, 549 N.E.2d 240.) "[I]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *People v. Barnard* (1985), 104 Ill. 2d 218, 238, 470 N.E.2d 1005.

■ First, the defendants assert that their attorney should have filed motions to quash their arrests and to suppress Bryant's identification. As the State notes, decisions to file motions to suppress or quash involve matters of trial strategy and therefore are not challengeable as ineffective assistance of counsel. (*People v. Atkins* (1987), 161 Ill. App. 3d 600, 515 N.E.2d 272; *People v. Johnson* (1986), 143 Ill. App. 3d 34, 492 N.E.2d 574.) Thus, we reject this contention. Moreover, we are satisfied that the evidence supports the conclusion that the defendants' arrests were lawful.

Second, Buddy and George argue that their counsel was ineffective because she failed to impeach Gaal regarding the difference between his reports and his testimony about the box cutter. In their reply brief, they argue for the first time that their attorney did not impeach Gaal with his reports because she had "a real conflict of interest that she failed to present to the trial court."

On the morning of trial, George explained that he wanted either a new assistant public defender or a private attorney. The defense attorney made a motion to withdraw, noting that she was concerned about "a conflict of interest" and that she "initially made a motion for appointment of a multiple defendant attorney because [she] felt there was a conflict in representing two people who are brothers." The judge asked: "And the basis of that [motion] was not a conflict

between their defenses but because of their relationship?" When the defense attorney replied, "Yes," the judge denied the request to withdraw.

The defendants argue that a *per se* conflict of interest rule requiring reversal applies to this case. (See *People v. Taylor* (1988), 165 Ill. App. 3d 1016, 1020, 520 N.E.2d 907.) It is well settled, however, that joint representation of codefendants does not give rise to the *per se* rule. (*Taylor*, 165 Ill. App. 3d at 1021; *People v. Conley* (1983), 118 Ill. App. 3d 122, 129, 454 N.E.2d 1107.) In fact, the defendants "must show the existence of an actual conflict and actual prejudice." (*Taylor*, 165 Ill. App. 3d at 1021.) To show such a conflict, a defendant must show "hostility of interests" between himself and his codefendant, such as antagonistic defenses. *Taylor*, 165 Ill. App. 3d at 1021.

■ Buddy and George presented identical alibi defenses which were not antagonistic in any way. The entire basis for the defendants' conflict of interest argument is their attorney's failure to cross-examine Gaal about his arrest reports and their speculation about her motive for moving to withdraw. They have the burden of proving this issue, yet they point to no "actual conflict" or "actual prejudice" suffered from a conflict and make no showing of hostility of interests. (See *People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944.) Therefore, we reject their assertion that they were denied the effective assistance of counsel because they were jointly represented by a single attorney.

We also hold that the failure to cross-examine Gaal about his arrest reports was not ineffective assistance of counsel because it did not prejudice Buddy and George. The arrest reports did not "completely impeach" Gaal, who remained consistent in his assertion that a box cutter was recovered from a defendant. Further, the trial judge, sitting as the finder of fact, had the arrest reports when she made her findings. In fact, in their argument about the sufficiency of the evidence on this point, the defendants tell us that we should be "aware of the fact that the common law record was, at all times, available to the trial judge." We note that "[t]he value of the potentially impeaching material [supporting an ineffective assistance claim] must be placed in perspective." (*Jimerson*, 127 Ill. 2d at 33.) When the failure to explicitly bring forth this marginally impeaching material, which was known to the trial judge, is placed in perspective with all the other evidence of Buddy and George's guilt, it is clear that the defendants cannot show prejudice.

For all these reasons, we affirm the judgments of the circuit court.

Judgment affirmed.

McNAMARA and GIANNIS, JJ., concur.