THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL McCLEARY, Defendant-Appellant.

First District (6th Division) No. 1—88—0203

Opinion filed December 28, 1990.

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael M. O'Brien, and Adam D. Grosch, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant was found guilty but mentally ill of murdering two men, Tony King and Ivory Barrett. The trial court sentenced defendant to mandatory life imprisonment. On appeal, defendant contends: (1) that the jury was incorrectly instructed on the guilty but mentally ill verdict; (2) that the voluntary manslaughter instructions were improper; (3) that the State failed to prove beyond a reasonable doubt that defendant was not legally insane at the time of the crime; (4) that the trial court erred in denying defendant's motion to quash arrest and suppress all the evidence; (5) that the trial court erred in determining that defendant's statements were voluntary; (6) that the trial court improperly admitted evidence that defendant requested *Miranda* warnings where defendant raised an insanity defense; (7) that he was denied effective assistance of counsel; (8) that the trial court erred in failing to inquire into the prospective jurors' bias toward the State's burden of proof; (9) that the trial court's imposition of a natural life sentence without considering mitigating factors violated the eighth and fourteenth amendments to the United States Constitution; and (10) that the trial court improperly sentenced defendant under the mandatory natural life statute.

Because defendant does not challenge the jury's finding that he committed the crimes, we will summarize the evidence. On May 14, 1986, defendant beat the two victims to death with a metal rod in the vicinity of 730 W. Wayman Court in Chicago, a railyard area with abandoned warehouses and loading docks, under which defendant lived in a cubbyhole.

At trial, the State presented physical and forensic evidence which connected defendant to the crime scene. It also offered evidence detailing the discovery of the bodies; the appearance of the crime scene; defendant's actions following the murders; and defendant's confession.

In his confession, defendant stated that after he purchased a bot-

tle of liquor at a bar, a male approached and asked him to share the bottle. Defendant refused and left the bar, walking towards his "home" on Wayman Court under a loading dock. When defendant arrived at his cubicle, the man who followed him was joined by a second man. The men asked that defendant share his bottle, and after defendant refused, the men began throwing sticks and stones at defendant. Defendant picked up a metal bar and began hitting the men. Defendant dragged both men to· a point east of the cubbyhole, placed the iron bar inside his cubbyhole and then started a fire in front of his cubbyhole. Defendant later stated that he did not drag the victims but rather ordered them to walk and then kneel down on the ground, and then hit them with the metal bar.

Dr. Robert A. Reifman, a psychiatrist and clinical director of the Psychiatric Institute of the circuit court of Cook County, testified for the defense. In his opinion, on May 14, 1986, defendant lacked the substantial capacity to appreciate the criminality of his acts and to conform his conduct to the requirements of the law.

Dr. Reifman examined defendant in 1975 to determine his state of mind in connection with a different criminal charge. At that time Dr. Reifman diagnosed defendant as "schizophrenia paranoid type." Dr. Reifman examined defendant five times, twice in 1975, twice in 1976 and once in 1977, each examination lasting approximately 45 minutes. According to Dr. Reifman, defendant has "been consistently schizophrenic more or less" from 1973 to the present. In fact, according to Dr. Reifman, all six psychiatrists who examined defendant over the years diagnosed him as paranoid schizophrenic. Dr. Reifman testified that defendant was hospitalized twice for several days in 1977 and 1982 and once in 1977 for 2½ months.

In December 1986, Dr. Reifman examined defendant twice in connection with this case. He reviewed his records from the previous examinations of defendant, the records of the Psychiatric Institute, records from defendant's hospitalizations, bureau of identification records, the police reports, the photos taken for this case and a social history given by defendant's aunt. Defendant denied hearing voices at the time. In his report, Dr. Reifman stated that defendant was legally insane and unable to conform his conduct to the requirements of the law at the time of the crimes. Although not reflected in his report, the doctor concluded that defendant was not able to appreciate the criminality of his conduct based upon defendant's belief that he was acting in self-defense.

Dr. Reifman testified further that defendant suffered from paranoid delusions of persecution for the past 25 years. As such, defend-

ant constantly feels he is under attack or in danger of being attacked, whether actual or not, and often misinterprets the degree of any real or imagined attack and quickly overreacts to anything he interprets as negative. According to Dr. Reifman, these paranoid delusions account for the many fights that defendant, whom the doctor described as "explosive," has been in over the years. Dr. Reifman further testified that defendant does not think logically or coherently or focus on relevant material. He is suspicious and guarded. According to Dr. Reifman, under stress defendant becomes more disorganized and less able to perceive and understand his environment. Dr. Reifman denied that defendant was feigning mental illness. Rather, he testified that defendant did not want to be known as a crazy person and, in fact was "malingering sanity." Further, he stated that defendant was upset that mental illness was an issue in this case.

Dr. Karen Smith, a psychologist, also testified for the defense. On December 19, 1986, she conducted a clinical interview and administered three projective tests to defendant during a one- to two-hour period. These tests, the Rorschach Ink Blot Test, the House, Tree, Person Test and the Thematic Apperception Test, are designed to evaluate emotional adjustment, interpersonal relations and character style. She generally relies principally upon the Rorschach to determine the degree of psychosis. She found that defendant's test scores differed significantly from the norm and that each test indicated signs of psychosis. She found that defendant's thinking was "grossly disturbed" and consistent with that of a paranoid schizophrenic. According to Dr. Smith, as of December 19, 1986, defendant was a paranoid schizophrenic who if attacked or believed he was attacked would not conform his conduct to the law because of his delusion.

In Dr. Smith's opinion, on May 14, 1986, the degree of defendant's delusional thinking rendered him unable to conform his conduct to the requirements of the law. She did not, however, have an opinion as to whether defendant appreciated the criminality of his conduct. The doctor based her conclusion in part on the fact that she found defendant at the highest level of psychological functioning in his life when she examined him in December 1986. Dr. Smith also observed a June 1986 staffing on defendant at the Psychiatric Institute at which Drs. Reifman and Grossman, but not Dr. Stipes, attended. At this staffing, Dr. Smith heard defendant state that even though the men were not moving and were covered with blood, he thought that they were alive, laughing and talking. Dr. Smith explained that defendant had grandiose and persecutory delusions and that his beliefs do not conform to reality. Further, she explained that defendant becomes less

able to perceive reality and act accordingly when confronted with other people, especially men. According to Dr. Smith, the December 1986 meeting with defendant was the sole basis for her diagnosis and she did not consider the opinions and tests of other psychiatrists.

The State offered the rebuttal testimony of Dr. Albert Henry Stipes, a staff psychiatrist at the Psychiatric Institute. He opined that on May 14, 1986, defendant was able to appreciate the criminality of his conduct and to conform his conduct with the requirements of the law. However, he testified that in his opinion, defendant was mentally ill at the time of the crimes.

Dr. Stipes examined the defendant three times, in September 1986, November 1986 and April 1987. At the September 1986 examination, the doctor was unable to form an opinion as to defendant's sanity at the time of the offenses because defendant was "grossly psychotic" and uncooperative, giving false and conflicting information. Dr. Stipes testified that he next examined defendant on November 3, 1986. After this 40-minute interview, he concluded that on May 14, 1986, defendant was able to appreciate the criminality of his conduct and able to conform his conduct to the requirements of the law. At this interview, the doctor found defendant cooperative and coherent and did not find any evidence of delusional thinking or hallucinations. Previously, he received the police reports, a psychology summary and reevaluation prepared by psychologist Dr. Lisa Grossman, psychiatric evaluation by Dr. Matthew Markus and psychiatric records from the Illinois Department of Mental Health. After making his report, the doctor reviewed the reports of Drs. Reifman and Smith, reviewed Dr. Stern's reports on the victims' deaths and again examined defendant in April 1987. His opinion as to defendant's sanity at the time of the crime, however, did not change.

Dr. Stipes found it significant in reaching his conclusion of sanity that defendant acted reasonably on the day of the crimes. Specifically, he noted that defendant moved the bodies away from his dwelling and that a metal bar was "found underneath something" in his cubicle. According to Dr. Stipes, these two factors evidence defendant's awareness of his guilt. On cross-examination, however, he conceded that neither of these factors taken alone indicated sanity, but rather when taken with other factors tend to show that defendant acted rationally. Dr. Stipes acknowledged that defendant did not tell him that he "hid" the alleged weapon, but rather he read it in a police report. Further, he agreed that a paranoid schizophrenic typically hides things because of his fear that people will take things from him. The doctor found no evidence that defendant ever tried to fake his mental

illness over the years and, in fact, he often denied his symptoms. Dr. Stipes identified this as an important sign of a person who is deeply disturbed.

During its case in chief, the State also offered the testimony of Officers Harrington, Duran and Ziegler regarding defendant's sanity. All three officers testified that they noticed nothing unusual about defendant's behavior. Ziegler described defendant's demeanor as calm and polite. Harrington and Duran believed that defendant was able to conform his conduct to the law and appreciate the criminality of his actions.

Defendant initially contends that the jury received an improper instruction which requires reversal of his conviction of guilty but mentally ill (GBMI). He argues that the trial court mistakenly instructed the jury that the preponderance of the evidence standard, rather than the reasonable doubt standard, applied in determining his sanity.

■■ ■ The statute which authorizes the GBMI verdict sets forth the elements and burden of proof required. It provides as follows: "[The GBMI verdict] requires a unanimous finding by the jury *beyond a reasonable doubt* that the defendant committed the acts charged and that the defendant was not legally insane at the time of the commission of those acts but that he was mentally ill at such time." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) Thus, a GBMI verdict requires that the State prove three elements beyond a reasonable doubt: that the defendant committed the act; that the defendant was not insane; and that the defendant was mentally ill. *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.

In this case, however, the trial court instructed the jury that it could find defendant guilty but mentally ill if it found:

"First: Beyond a reasonable doubt, *** that the defendant has committed the offense charged.

Second: *By a preponderance of the evidence,* *** that the defendant was sane at the time of the commission of the offense.

Third: That the defendant was mentally ill at the time of the commission of the offense." (Emphasis added.)

This instruction incorrectly informed the jury that to return a GBMI verdict, they need only find defendant sane by a preponderance of the evidence. The State concedes that the instruction misstated the burden of proof, but argues that the error was harmless because defendant would have been found guilty but mentally ill even with the proper instructions. We do not agree.

■■ ■ In order to conclude that an error in jury instructions was

harmless, it must be shown that the result of the trial would have been the same if the jury had been properly instructed. (*People v. Fierer*, 124 Ill. 2d 176, 529 N.E.2d 972.) Further, the standard of review for an error which affects the Federal constitutional right to a fair trial is whether there is a reasonable possibility that the error contributed to the defendant's conviction. (*People v. Fields* (1988), 170 Ill. App. 3d 1, 13, 523 N.E.2d 1196; *People v. Merideth* (1987), 152 Ill. App. 3d 304, 319, 503 N.E.2d 1132, *appeal denied* (1987), 114 Ill. 2d 553, 508 N.E.2d 733.) Under either standard, we cannot conclude that the error in the GBMI instructions was harmless.

We find the holding of *People v. Fierer* to be dispositive of whether the instruction was erroneously given and whether it was harmless error. In *Fierer*, defendant's defense at trial was based on insanity and the jury was instructed on both the GBMI and the insanity verdicts. The statutes in effect at that time required defendant to prove insanity by a preponderance in order to get a not guilty by reason of insanity verdict, while the State bore the burden of proving sanity beyond a reasonable doubt for the GBMI verdict. (See Ill. Rev. Stat. 1985, ch. 38, pars. 3—2(b), 6—2(c), 115—4(j).) The trial judge found the two provisions "irreconcilable" and erroneously instructed the jury that it could return a GBMI verdict if it found by a preponderance of the evidence that the defendant was sane, in addition to proving the other two elements beyond a reasonable doubt.

Our supreme court reversed the defendant's conviction and remanded based upon this error, which it concluded was not harmless. The court wrote:

> "The modification of the burden of proof from 'not insane beyond a reasonable doubt' to 'sane by a preponderance of the evidence' had the undeniable effect of making the GBMI verdict easier to attain and more likely to result. If the jury, properly instructed, had been unable to conclude that the defendant was sane beyond a reasonable doubt, it would have faced a more difficult choice between guilty or not guilty. We need not speculate as to the outcome of the decisionmaking process. It is enough to say that the altered GBMI instruction might have affected that outcome. Therefore, the alleged error cannot be viewed as harmless." *Fierer*, 124 Ill. 2d at 187-88, 529 N.E.2d at 976.

The *Fierer* court's analysis requires us to conclude that this error was not harmless. In this case, the jury received the same inaccurate instruction as did the jury in *Fierer*. This instruction indisputably lessened the State's burden and made it easier for the jury to return

a GBMI verdict, because the instruction only required proof of sanity by a preponderance of the evidence. It appears from the record that testimony as to defendant's sanity was sharply divided. Two expert witnesses testified for the defense that defendant was insane, while the State offered the testimony of Dr. Stipes and three police officers that defendant was sane. The giving of the instruction could not be considered harmless error, and it mandates a remandment for a new trial.

Defendant also complains that the jury instructions on voluntary manslaughter erroneously stated the prosecutor's burden under *Reddick*. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.) Since we are remanding the case on the basis of the burden of proof instruction, it is unnecessary to address the *Reddick* issue because on remand the jury will receive the proper voluntary manslaughter instruction. For the same reason, it is unnecessary to consider defendant's contention that he received ineffective assistance of counsel.

Since this case will be retried, we shall consider other contentions which may arise.

We reject defendant's contention that the trial court improperly denied defendant's motion to suppress his statements. On appeal, defendant argues that his statements were involuntary, and thus inadmissible, for two reasons: defendant was incapable of waiving his *Miranda* rights; and defendant's will was overborne by improper police activity when the police questioned defendant without first giving him the opportunity to finish his meal. We conclude, however, that the circumstances surrounding defendant's statements in this case are sufficient to sustain the trial court's finding of voluntariness.

■■ ■ The test of whether a statement is admissible at trial is whether it has been made freely, voluntarily and without compulsion or inducement or whether the defendant's will was overcome at the time he confessed. (*People v. Maldonado* (1988), 193 Ill. App. 3d 1062, 1067, 550 N.E.2d 1011.) Moreover, wrongful or coercive police conduct is a necessary precursor to finding that a confession is involuntary. (*Colorado v. Connelly* (1986), 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515.) The trial court need only be convinced by a preponderance that the confession was voluntary. (*People v. Reed* (1984), 123 Ill. App. 3d 52, 59, 462 N.E.2d 512.) Further, the trial court determines voluntariness from the totality of the circumstances, and its determination will not be disturbed on review unless it is against the manifest weight of the evidence. *People v. Mays* (1989), 176 Ill. App. 3d 1027, 1033, 532 N.E.2d 843.

■■ We reject defendant's argument for several reasons. Defend-

ant claims that his statement was involuntary because he was incapable of waiving his *Miranda* rights. However, *Miranda* protects against government coercion that leads defendant to confess, not against "moral and psychological pressures to confess [which] emanat[e] from sources other than official coercion." (*Colorado v. Connelly,* 479 U.S. at 170, 93 L. Ed. 2d at 486, 107 S. Ct. at 523-24.) Defendant submits that the police acted improperly by questioning him before he ate his meal. Defendant stresses that the police knew that he, a street person, insisted on eating his food and appeared hungry and hyper. Indeed, Officer Ziegler told defendant to put his food down while they spoke. As such, defendant concludes, the police acted wrongfully by questioning defendant, and his statements were involuntary.

■ We do not believe that by questioning defendant before he finished his meal, the officers' conduct rose to the level of improper or coercive police activity protected by the fifth amendment. At defendant's request, Officer Sanchez read the *Miranda* rights on the way to the county morgue to identify the victims, but did not then question defendant. Rather, during the car ride, defendant continued to eat. At the morgue, Officers Duran and Sanchez went into the building, leaving defendant in the car, presumably still eating. When the officer came out to the car, he again read defendant his *Miranda* rights and asked him whether he understood them, to which defendant responded affirmatively. When asked whether he wanted to talk about the crimes, defendant said, "Sure, what do you want to know?" Although the officer asked defendant to put his food down while they spoke, the officer said that defendant was coherent, cooperative and calm. These circumstances do not suggest any wrongful police conduct, but rather demonstrate that defendant confessed voluntarily. Without the requisite showing of police misconduct, we agree with the trial court that admitting defendant's statements did not violate his constitutional rights.

Defendant next contends that the trial court erred in denying his pretrial motion to quash arrest and suppress all the evidence because the statements resulted from an illegal arrest. We agree with defendant that the trial court's finding that defendant's arrest did not occur until he was taken to the morgue after the police picked him up was erroneous. However, this is of no consequence because we conclude that the police had probable cause when he was picked up.

■ Probable cause exists when the police possess enough evidence to lead a reasonable man to believe that a crime has been committed and that the defendant committed it. (*People v. Neal* (1985),

111 Ill. 2d 180, 193, 489 N.E.2d 845.) Further, the totality of the facts and circumstances known to the police officers must be considered. (*People v. Montgomery* (1984), 112 Ill. 2d 517, 525, 494 N.E.2d 475.) In determining probable cause, police may consider as relevant the closeness in geographic location and time between crime and arrest. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 399-400, 495 N.E.2d 984.) The police may also properly rely on information from a private citizen without first verifying the citizen's reliability. (*People v. Sain* (1984), 122 Ill. App. 3d 646, 650-51, 461 N.E.2d 1043.) Finally, a reviewing court must not disturb the trial court's findings on probable cause unless they are manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766.

 Applying these principles, we conclude that the police had sufficient information to arrest defendant. When the police officers picked up defendant on the street, they knew the following: that two men were murdered on Wayman Court, in Chicago; that the victims were severely beaten in the head and face and other parts of the body; that a metal pipe which appeared to be stained with blood was found in a cubbyhole under a loading dock approximately 5 to 10 yards from where police found the victims; that a witness saw "Crazy Man" with a metal pipe near the crime scene approximately 24 hours before police began to investigate at the scene; that "Crazy Man" was a black man with a bad right eye wearing a French beret; that "Crazy Man" lived in a cubbyhole under a loading dock about 5 to 10 yards from the victims; that police saw a man about five blocks from the crime scene who had a bad right eye and a French beret; and that this man identified himself to police as "Crazy Man." Based upon these facts known to police at the time they picked up defendant, probable cause existed to believe the crime was committed and that defendant committed the crime. Therefore, the arrest was legal and the trial court properly denied defendant's motion to quash arrest.

We also reject defendant's contention that the State failed to prove beyond a reasonable doubt that defendant was not insane at the time of the crime.

 ■ A defendant's sanity at the time of the crime is a question of fact, and a finding on this issue will not be disturbed unless so improbable as to raise a reasonable doubt as to defendant's sanity. (*People v. Eckhardt* (1987), 156 Ill. App. 3d 1077, 1090, 509 N.E.2d 1361.) Further, the trier of fact, in deciding the question of sanity, may accept one expert's opinion in its entirety and reject another's (*People v. Taylor* (1982), 110 Ill. App. 3d 112, 118, 441 N.E.2d 1231), reject all expert testimony, relying entirely on lay testimony (*People v.*

*Palmer* (1985), 139 Ill. App. 3d 966, 974, 487 N.E.2d 1154), or accept part and reject part of each expert's testimony (*People v. Grice* (1984), 121 Ill. App. 3d 567, 569, 459 N.E.2d 1122). The weight given to expert testimony depends upon the facts and reasoning used to support the opinion. (*People v. Williams* (1990), 201 Ill. App. 3d 207, 216, 558 N.E.2d 1248.) Further, lay witnesses' opinions on defendant's sanity may be used if those opinions are based upon personal observations of or conversations with defendant. *People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 99, 524 N.E.2d 1112.

■■ The jury here could easily have afforded the State's witnesses' testimony more weight than defendant suggests. Although defendant presented testimony of two experts who found him insane, these experts focused primarily on defendant's mental health history and on evaluations done six or seven months after the crime. Indeed, Dr. Smith did not even read the police reports prior to drawing her conclusion, but rather based her opinion solely on the psychological testing performed a substantial time after the incident. By contrast, Dr. Stipes, the State's expert, based his opinion of sanity primarily upon defendant's words and actions around the time of the murders. Additionally, Officers Duran and Harrington spent more time with defendant than did the doctors. Further, the opinions of Duran and Harrington as to defendant's mental state at the time of the crime were based upon their contact with defendant within 24 hours of the crime as compared to the opinions of defendant's experts, who evaluated defendant six or seven months after the crime. The jury could have reasonably found that the officers' observations supported Dr. Stipes' opinion.

Based upon the above evidence, the jury could reasonably have determined that the opinions of the State's witnesses warranted more weight than those of the defendant. Therefore, we do not find the jury's finding of sanity so improbable or unsatisfactory as to raise a reasonable doubt.

■■ ■ Defendant also contends that the testimony of Officer Duran and the stipulation of Officer Sanchez regarding defendant's request to be read his *Miranda* rights as evidence of his sanity was improper. Although we recognize that defendant may have waived this issue by failing to raise it at trial or in his post-trial motion, we consider it for purposes of retrial. Defendant relies on cases which hold that the State may not constitutionally use the following as evidence of defendant's sanity: defendant's post-*Miranda* silence (*Wainright v. Greenfield* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634); defendant's post-*Miranda* statements of intent to remain

silent *(People v. Stack* (1986), 112 Ill. 2d 301, 493 N.E.2d 339); and defendant's post-*Miranda* request for counsel *(People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609). Here, the testimony and stipulation of the officers merely show that immediately after arrest, defendant stated that he wanted his rights. During closing argument, the State did not argue that defendant's request to be read his rights evidenced his sanity, nor did the State even mention the utterance. *(Cf. Wainright v. Greenfield,* 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634 (comments in closing argument, over defendant's objections); *People v. Ahmad* (1990), 206 Ill. App. 3d 921 (comments in closing arguments); *People v. Vanda,* 111 Ill. App. 3d 551, 444 N.E.2d 609 (comments in closing arguments).) If any error occurred, it was harmless.

We comment briefly on defendant's contention that the trial court erred in failing to ask jurors either individually or as a group whether they would hesitate returning a not guilty verdict if the State failed to meet its burden, or a guilty verdict if the State proved its case beyond a reasonable doubt. *(People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062.) Our review of the *voir dire* proceedings reveals that the trial court met the *Zehr* requirements by remarks made at the *voir dire* proceedings.

Finally, we are compelled to comment on defendant's two arguments regarding his sentencing. The jury found defendant guilty on two counts of murder. After defendant waived the jury for sentencing, the court found him ineligible for the death penalty and sentenced him to natural life imprisonment pursuant to statute. Section 5—8—1 of the Unified Code of Corrections provides:

"(a) *** A sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for murder, *** (b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment, or (c) if the defendant has previously been convicted of murder under any state or federal law or is found guilty of murdering more than one victim, the court shall sentence the defendant to a term of natural life imprisonment." (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—1(a)(1)(b), (a)(1)(c).)

Defendant first argues that imposing a natural life sentence without

considering mitigating factors violates the eighth and fourteenth amendments to the Federal Constitution.

■ Defendant's position is without authority and has been specifically rejected by our supreme court in *People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 518 N.E.2d 1047, and *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059.

The *Strayhorn* court found that after exercising his discretion to reject the death penalty, the trial judge had no further discretion because "the statute unequivocally mandates natural life imprisonment for the murder of two or more persons." (*Strayhorn*, 119 Ill. 2d at 336, 518 N.E.2d at 1050.) Moreover, in *People v. Taylor*, the supreme court stated that the legislature may properly fix mandatory minimum penalties when it "determine[s] that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders" and specifically held that this statute does not violate article I, section 11, of the Illinois Constitution. *Taylor*, 102 Ill. 2d at 206, 464 N.E.2d at 1062.

■ We also reject defendant's argument that the trial court should have sentenced defendant under the discretionary natural life sentence provision, instead of under the mandatory life imprisonment provision, which allows the judge no discretion. Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—1(a)(1)(b), (a)(1)(c).

Defendant contends that because these provisions furnish no basis to distinguish which defendants should be sentenced under which provision, but rather give "standardless discretion" to the judge, the statutory scheme violates the due process and equal protection clauses of the Illinois and United States Constitutions and article I, section 11, of the Illinois Constitution. The State responds that the trial judge properly sentenced defendant under the mandatory life imprisonment provision of section 5—8—1(a)(1). We agree with the State.

In *People v. Winchel* (1987), 159 Ill. App. 3d 892, 512 N.E.2d 1298, this court decided this precise issue. In *Winchel*, defendant was convicted of murdering two people and sentenced to natural life imprisonment. Defendant argued, as does defendant in the instant case, that section 5—8—1 provides no basis upon which to distinguish defendants to be sentenced under one or the other subsection, thus allowing the trial court to unconstitutionally impose different sentences for the same kind of offense.

This court rejected defendant's claim, relying on *People v. Taylor* (102 Ill. 2d 201, 464 N.E.2d 1059). The court wrote:

"[T]he legislature intended to make a mandatory natural life sentence the controlling sentencing provision for those con-

victed of, *inter alia*, multiple murder. That is, under subsection (a)(1)(c), multiple murderers are required to be sentenced to a natural life term where a death sentence is not imposed. That this provision precludes the trial court's exercise of any sentencing discretion does not vitiate its validity." *Winchel*, 159 Ill. App. 3d at 921, 512 N.E.2d at 1316.

We thus find no merit in defendant's argument that the trial court unconstitutionally sentenced him to a mandatory life sentence.

Accordingly, the judgment of the circuit court is reversed and the cause is remanded for a new trial consistent with this opinion.

Reversed and remanded.

LaPORTA, P.J., and EGAN, J., concur.