THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES GASTON, Defendant-Appellant.

First District (5th Division)   No. 1—92—0945

Opinion filed March 11, 1994.

Rita A. Fry, Public Defender, of Chicago (Julie M. Campbell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, Dori K. Leo, and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a bench trial, defendant James Gaston was found guilty of armed robbery and sentenced to life imprisonment. Defendant appeals both his conviction and sentence.

On December 19, 1987, a robbery occurred at the J&J Fish Market, which was owned and operated by Tae Lee. On January 17, 1988, the police received a call from Judy Rush, implicating defendant in the robbery. The following day, defendant was arrested and charged with armed robbery and aggravated unlawful restraint.

Defendant filed a motion to suppress his lineup identification. At the hearing on this motion, Judy Rush testified that on January 18, 1988, the police took her to J&J Fish Market, where she met with Tae Lee and gave him a description of the man who committed the robbery. She told Lee that the man was tall with glasses, brown skin and had a large nose. She then went to the police station and sat with Lee for about two hours and again described defendant to Lee. Rush testified that she was then taken to another room where she identified defendant, who was the tallest man in the lineup. After she identified defendant in the lineup, Lee also picked defendant out of the lineup.

Lee testified at the suppression hearing that when Rush and the

police came to his store, he did not speak with Rush. Later, at the police station, Rush told Lee what defendant looked like. According to Lee, Rush did not tell him who to pick out of the lineup and he picked defendant out of the lineup because he looked like the robber.

Officer Dawson testified that at the second district police station, Rush and Lee were in close proximity for 30 to 50 minutes before they were taken to Area One. Detectives Glynn and Regan testified that Rush and Lee were placed in an office in Area One where they waited until the lineup was prepared. Lee was then brought into a room where he viewed the lineup and identified defendant. After identifying defendant, Lee was taken to another room, not the room that he had been in with Rush. Rush was then brought into a room where she was able to view the lineup. She identified defendant as the man that she claimed robbed J&J Fish Market.

Officer Argenbright testified that he met with Judy Rush, and during this conversation, Rush implicated the person she was living with in an armed robbery. Based on this information, Argenbright went to defendant's apartment and arrested defendant. Later, Rush and Argenbright went to the store Rush claimed defendant robbed, J&J Fish Market. Lee gave Argenbright a description of the man who robbed him and then Lee and Rush conversed. Argenbright took Rush to the second district station. Lee later arrived at the station, and Lee and Rush sat together before they were taken to Area One to view a lineup.

The trial court denied defendant's motion to suppress his lineup identification. Both parties stipulated that the evidence heard during the motion would be the same evidence heard at trial.

During defendant's bench trial, Lee testified through a Korean interpreter that he owned and operated J&J Fish Market located at 202 East 51st Street in Chicago. Lee testified that on December 19, 1987, he was about to close his store and had counted the money in the cash register. He put $300 in his pocket and $300 in the register, along with $100 worth of food stamps. Two employees, Ron Smith and Jorrod Hicks, and a beggar were in the store when a man entered, pointed a sawed-off shotgun at Lee's chest and took him to a back bathroom. The man searched Lee and took the $300 from his wallet. After the man left the bathroom, Lee heard him say "If you guys, if any of you move I'm going to kill you." Defendant came back into the bathroom, got the register keys from Lee and left. Lee came out of the bathroom after he heard one of the employees say that the man had left and discovered that the cash register was missing.

Jorrod Hicks testified that he was working at J&J Fish Market on December 19, 1987, when two men walked into the store. Defen-

dant pulled out a shotgun and said, "It's a stick up." The other man pulled out a gun and told Hicks to lie face down. Hicks testified that defendant took Lee to the bathroom and came back with something that sounded like keys. The other man said, "Anybody, move. I'm going to blow your damn head off. Don't even look up." The men then left with the cash register. Hicks testified that about a week after the incident, he looked at some pictures at the police station and he told an officer that defendant looked like one of the men who committed the robbery. Hicks testified that about three weeks after the incident, he stopped working at the fish market.

Officer Brown testified that he interviewed Rush on January 17, 1988, and Rush gave Brown a strip of paper with various figures and initials on it. This piece of paper was marked People's exhibit No. 1.

Officer Argenbright testified at trial that he and Officers Dawson, Cox and Dobb talked to Rush in the lobby of defendant's apartment building on January 18, 1988. Argenbright told Rush to call defendant in his apartment to see if he was home before they went to find him. When defendant answered the phone, the officers took the elevator to the sixth floor while Rush hid in the lobby. When the officers exited the elevator on the sixth floor, defendant saw the officers and entered his apartment. Defendant ignored the officers' order to stop and attempted to close the door on the officers. The officers entered defendant's apartment and asked his name. Defendant responded, "Robert Kennedy." Defendant finally admitted to being James Gaston. Defendant was then placed under arrest.

Judy Rush testified that she had known defendant for about seven years, she was his girl friend and they lived together. Rush testified that on December 19, 1987, she was at home with defendant. Defendant left the house at about 10:30 p.m. for about 20 or 25 minutes. Rush testified that her girl friend, Eujeana, lived downstairs and Jorrod Hicks was Eujeana's boyfriend. Hicks was in Rush's house on two or three occasions and each time Hicks saw defendant.

Rush testified that on January 17, 1988, after catching defendant in bed with his ex-wife, she immediately called the police, told them she was Bobby Rush's sister and that defendant had committed an armed robbery. Rush testified that she notified the police because she wanted to "get even" with defendant. When Rush was unable to give the police any information about where the robbery occurred, Rush went to her friend Eujeana's apartment and asked her where Hicks worked. Eujeana told her that Hicks had worked at J&J Fish Market but had been fired because the owner thought he had something to do with the robbery. Rush then called back the police and told them where the robbery occurred. Rush testified at trial that when she

called the police, she had no personal knowledge that defendant was involved in any robbery. According to Rush, she later informed the police that she had lied about the robbery and that the information she had given to them was false. Rush testified that People's exhibit No. 1 was not the piece of paper she gave to the police.

Rush admitted that on January 18, 1988, she told the police that on December 19, 1987, defendant received a sawed-off shotgun from two men who came to her apartment. Defendant fastened that sawed-off shotgun by a shoelace over his shoulder and hung the shotgun under his jacket. She also told the police that defendant left the house around 10:30 p.m. and when he returned around midnight, Rush heard defendant talking about a cash register. She saw defendant writing on a piece of paper and dividing money. Rush told the police that defendant, Hicks, and two other men named Berry and Smith were planning a robbery.

Jorrod Hicks testified on rebuttal that he had never met defendant. Eujeana Nathaniel testified that she never had a conversation with Rush regarding the robbery.

The trial court found defendant guilty of armed robbery. Defendant filed a motion for a new trial, and the State filed a motion to have defendant sentenced as an habitual criminal. Both motions were denied and defendant was sentenced to 15 years' imprisonment.

The State filed a motion for supervisory order or a writ of *mandamus* in the Illinois Supreme Court requesting that the trial court be ordered to sentence defendant as an habitual criminal. In that motion, the State argued that the trial court erroneously refused to consider defendant's 1976 conviction when analyzing whether defendant was eligible for a mandatory life sentence. The supreme court exercised its supervisory jurisdiction and ordered defendant's sentence of 15 years' imprisonment to be vacated. In addition, the trial court was ordered to conduct further proceedings which comport with the dictates of the Habitual Criminal Act. 720 ILCS 5/33B—1 (West 1992).

After the mandate was issued, defendant filed a motion for judgment notwithstanding the verdict and a motion for a new trial. The trial court stated that after reviewing its notes, the court realized that it erred in finding defendant guilty. The trial court therefore granted defendant's motion for judgment notwithstanding the verdict, defendant was found not guilty and was discharged.

The State filed another motion for supervisory order or writ of *mandamus* in the Illinois Supreme Court and requested that the trial court be compelled to vacate its order finding defendant not guilty and to impose the mandatory natural life term of imprisonment

required under the Habitual Criminal Act. The State argued that the trial court did not follow the first order from the Illinois Supreme Court which required that a sentencing hearing be held. The State argued that the trial court only had jurisdiction to hold a sentencing hearing pursuant to the Habitual Criminal Act and had no authority to grant the motion for judgment notwithstanding the verdict.

The supreme court issued an order directing the trial court to vacate its order finding defendant not guilty of armed robbery and releasing him from custody. The supreme court also directed the trial court to impose the mandatory natural life term of imprisonment pursuant to the Habitual Criminal Act.

The trial court then sentenced defendant to natural life imprisonment. On appeal, defendant contends that: (1) there was no probable cause to arrest defendant and he received ineffective assistance of counsel because his attorney failed to file a motion to quash his arrest and suppress evidence; (2) the trial court improperly denied defendant's motion to suppress his lineup identification; (3) double jeopardy bars defendant's resentencing to natural life imprisonment pursuant to the requirements of the Habitual Criminal Act; (4) the Habitual Criminal Act is unconstitutional; and (5) the State failed to prove beyond a reasonable doubt that defendant is guilty of armed robbery.

Defendant first contends that his lineup identification was the fruit of an unlawful arrest, because there was no probable cause to arrest him. Defendant also argues that he received ineffective assistance of counsel because his defense attorney did not file a motion to quash defendant's arrest.

Probable cause exists when the police possess enough evidence to lead a reasonable man to believe that a crime has been committed and that the defendant committed it. (*People v. McCleary* (1990), 208 Ill. App. 3d 466, 567 N.E.2d 434.) A trial court's finding of probable cause will not be reversed unless the finding is against the manifest weight of the evidence. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.) The totality of the facts and circumstances known to police must be considered. *People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475.

■ Our review of the record reveals that the police had probable cause to believe that a robbery had been committed and that the defendant committed it. Rush informed the police that defendant had been involved in the robbery of J&J Fish Market on December 19, 1987. Rush told the police that defendant received a sawed-off shotgun from two men who came to her apartment. Defendant fastened a shoelace to the shotgun and hung it over his shoulder, under his

jacket. Defendant left the house and when he returned a few hours later, defendant talked about a cash register, wrote on a piece of paper and divided money. Rush even provided the police with the piece of paper, which contained initials with corresponding numbers, as well as the word "Gun" with a corresponding number. Three of the four people Rush told police were involved in the robbery had initials matching those written on the paper. One of the initials was a "G" which the police could assume stood for Gaston. In addition, the word "Gun" with a number next to it corroborated Rush's story that defendant received a gun from two men prior to the robbery. Based on this information, the police had probable cause to believe that a crime had been committed and that defendant committed it.

■ Furthermore, defendant cannot show that he received ineffective assistance of counsel by his counsel's failure to file a motion to quash. To successfully argue ineffective assistance of counsel, defendant must show that counsel's performance was inadequate and that he was prejudiced as a result of counsel's incompetence and thus was deprived of a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) Based on the above discussion, defendant cannot show that but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different.

Defendant next contends that his lineup was improper and that the in-court identification of him should have been suppressed. Evidence of a pretrial identification of a defendant by a witness must be excluded at trial only where the procedure was unnecessarily suggestive and there is a substantial likelihood of misidentification. (*People v. Hartzol* (1991), 222 Ill. App. 3d 631, 584 N.E.2d 291.) The defendant bears the burden of proving that the pretrial procedure was unduly suggestive. The court looks to the totality of the circumstances in reaching its decision. *People v. Sykes* (1987), 161 Ill. App. 3d 623, 515 N.E.2d 253.

■ Although Rush testified that on two separate occasions she gave Lee a description of defendant, Lee testified that Rush only described defendant once, at the police station, and that nobody told Lee whom to identify. Officer Argenbright testified that while at the fish market with Lee and Rush, Lee gave Argenbright a description of the person who robbed his store before Rush and Lee had any conversation. In addition, while Rush claimed that she was the first to identify defendant from the lineup, Lee and the police officers stated that Lee was the first to identify defendant. The trial court assessed the credibility of the witnesses, and its decision that the

lineup was not unduly suggestive is not against the manifest weight of the evidence.

Defendant next maintains he was put in double jeopardy when, after the trial court reconsidered its decision and acquitted defendant, the supreme court vacated that acquittal, reinstated defendant's conviction, and ordered that he be sentenced as an habitual criminal.

■ After the trial court acquitted defendant, the State filed its second writ of *mandamus* and motion for supervisory order arguing that the trial court failed to follow the supreme court's original supervisory order to proceed with a sentencing hearing pursuant to the Habitual Criminal Act. Defendant filed objections to the State's motion raising his double jeopardy argument that once defendant was acquitted, he could not be resentenced. The supreme court rejected defendant's objections and entered an order vacating defendant's acquittal, reinstating his conviction, and directing the trial court to sentence defendant to a mandatory life term pursuant to the Habitual Criminal Act. We can only conclude that in entering this order, the supreme court found resentencing constitutionally valid under State and Federal law.

It is not within our authority to overrule the supreme court or to modify its decisions. *(Beagley v. Andel* (1978), 58 Ill. App. 3d 588, 374 N.E.2d 929; *Belden Manufacturing Co. v. Chicago Threaded Fasteners, Inc.* (1967), 84 Ill. App. 2d 336, 228 N.E.2d 532.) Once an issue has been decided by the supreme court, the only question which may be considered upon a subsequent appeal involving the same issue is whether the trial court followed the supreme court's mandate. *(Rauschenberger v. Board of Education, Heritage Community Unit School District No. 8* (1991), 223 Ill. App. 3d 412, 584 N.E.2d 1050; *People ex rel. Maeras v. Chicago, Burlington & Quincy R.R. Co.* (1967), 36 Ill. 2d 585, 224 N.E.2d 248.) The supreme court's order vacating defendant's acquittal and reinstating defendant's conviction did not state that it was remanding for the trial court to conduct proceedings to determine defendant's eligibility for sentencing as an habitual criminal. Rather, the supreme court conclusively determined that defendant was in fact eligible for sentencing as an habitual criminal, and ordered the trial court to sentence defendant to a mandatory life term pursuant to the Habitual Criminal Act. Since the proceedings of the trial court were in accordance with the mandate of the supreme court, our analysis of defendant's double jeopardy claim can proceed no further.

■ Defendant also claims because the trial court found that the State failed to establish at defendant's original sentencing hearing that defendant was eligible for sentencing under the Habitual Crimi-

nal Act, double jeopardy prohibits his resentencing under the Act. The supreme court recently rejected this argument in *People v. Levin* (1993), 157 Ill. 2d 138. Furthermore, this is another instance where the supreme court, by virtue of its orders, rejected defendant's double jeopardy argument and found not only was it constitutional to resentence defendant as an habitual criminal, but that the certified copies of defendant's prior convictions, which had been attached to the State's motions to the supreme court, established that defendant was an habitual criminal. Once again, we have no jurisdiction to review this supreme court decision.

■ Defendant next contends that the Habitual Criminal Act is unconstitutional because it: (1) violates the Illinois and United States constitutional prohibitions against *ex post facto* laws; violates article I, section 11, of the Illinois Constitution because it requires the imposition of a natural life sentence without consideration by the court of the seriousness of the offense or the defendant's rehabilitative potential; and (3) violates due process under the Illinois and United States Constitutions and the eighth amendment to the Illinois Constitution, which prohibit cruel and unusual punishment, since it prohibits the consideration of mitigating evidence. Because this court has repeatedly upheld the constitutionality of the Habitual Criminal Act under attacks similar to those presented here, we need not address this issue any further than to say that we follow those cases. *People v. Garland* (1993), 254 Ill. App. 3d 827; *People v. Morissette* (1986), 150 Ill. App. 3d 431, 501 N.E.2d 781; *People v. Westefer* (1988), 169 Ill. App. 3d 59, 522 N.E.2d 1381.

Defendant's final argument is that he was not proven guilty beyond a reasonable doubt of armed robbery. The reviewing court must determine whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.

■ Our review of the evidence here does not reveal the trial court's decision to be against the manifest weight of the evidence. Rush implicated defendant in the robbery and told police that on the date of the robbery, defendant received a sawed-off shotgun, defendant put the shotgun under his jacket, and left the house around 10:30 p.m. When defendant returned at midnight, he talked about a cash register and wrote on a piece of paper. That piece of paper, which Rush gave to police, lists the number "313" next to the letter "C" and the number "100" next to the letters "ST." Lee testified that in the cash register stolen at the time of the robbery was $300 in

cash and $100 in food stamps. The paper also lists four numbers, totalling 413 next to four letters "H," "B," "G," and "B." The jury could reasonably have inferred that the letters refer to the individuals who took part in the robbery, with the letter "G" referring to Gaston. The numbers next to each letter could have reasonably been interpreted to refer to that person's share of the proceeds since the paper also represented the number "413" divided by "4." Also written on the piece of paper is the word "Gun" next to the numbers of "20" and "60," which likely relate to the cost of the shotgun Rush claimed defendant received on the night of the robbery.

The trial court had the opportunity to hear all the evidence and observe the demeanor of the witnesses, and we do not find its decision to be against the manifest weight of the evidence. The trial court was certainly entitled to believe Rush's initial statement implicating defendant, rather than her recanted testimony.

Accordingly, for the reasons set forth above, defendant's conviction and sentence are affirmed.

Affirmed.

MURRAY, P.J., and COUSINS, J., concur.