THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee v. MARK LOZANO, Defendant-Appellant.

First District (1st Division)   No. 1—00—0046

Opinion filed September 5, 2000.

506

Elliot T. Price, of Law Offices of Elliot T. Price, Ltd., of Buffalo Grove, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Annette Collins, and Maria Augustus, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COHEN delivered the opinion of the court:

The defendant, a Chicago police officer, was charged by indictment with armed robbery, attempt (armed robbery) and two counts of official misconduct. The charges were based on an encounter that the defendant and his brother-in-law had with two men outside a restaurant. The defendant searched one of the men at gunpoint while his brother-in-law searched the other man. The defendant found nothing on the man that he searched but his brother-in-law allegedly took money from the wallet of the other man. The defendant made a motion to suppress evidence and quash arrest on the grounds that police officers seized evidence and arrested him after entering his apartment without his consent and without a warrant. The trial judge denied the motion, finding that the defendant had freely given his consent for the officers to enter his apartment, that the evidence seized was in plain view and that the officers had probable cause to make the arrest.

A jury convicted the defendant of armed robbery and the count of official misconduct based upon the armed robbery, but acquitted him of attempt (armed robbery) and the count of official misconduct predicated upon the attempt. The trial court sentenced the defendant to a term of seven years' imprisonment for the armed robbery conviction and a concurrent term of two years' imprisonment for the official misconduct conviction.

The defendant now appeals, arguing that his convictions must be reversed because: (1) the trial court erroneously denied his motion to suppress evidence and quash arrest; (2) the jury's verdicts were legally inconsistent; and (3) the trial court erroneously allowed the prosecution to elicit on cross-examination both that the defendant's brother-in-law had previously been convicted of a felony and that there was a police department policy against officers associating with known felons.

We affirm.

## BACKGROUND

Defendant Mark Lozano, a Chicago police officer, testified that around midday on September 29, 1997, he and his friend Arturo Munoz were going to a local gym. Lozano did not have his service weapon and police identification with him at the time. As they were driving, a car suddenly pulled out in front of them, blocking their way. Immediately thereafter another car pulled out and blocked their way from the rear. Several individuals got out and surrounded Lozano's car while flashing gang signs and yelling slogans. Lozano understood from the slogans that they were members of a local street gang who thought that Lozano and Munoz were members of a rival gang. Lozano and Munoz told them that they were not members of that or any other gang. During the altercation that ensued, one of the men threw a rock through the windshield of Lozano's car. Munoz told the men that Lozano was a police officer and the men scattered. Lozano tried unsuccessfully to catch the person who had thrown the rock.

Lozano testified that he and Munoz then went on to the gym where he called the police. The police operator advised Lozano to return to the scene of the altercation where a squad car would meet them. They waited at the scene for about 10 minutes for the squad car to arrive and when it failed to appear they went to Lozano's apartment to again call the police. This time the police operator told them they could file a report over the phone. Munoz then filed a report. Lozano got ready for his shift, which was 3 p.m. to 11 p.m.

When Lozano finished his shift, he went to his brother's house. His brother-in-law Thomas Gonzalez (Thomas) also lived there.

Lozano still was wearing his uniform trousers and shoes. Lozano and Thomas left to go to Tito's Hacienda, a nearby restaurant. Outside the restaurant Lozano saw someone resembling one of the gang members who participated in the confrontation earlier that day. That individual, Lehman Benaga, was speaking with another man, José Gonzalez (José). Lozano and Thomas parked the car. As they walked toward the restaurant, Lozano thought he saw Benaga make a motion as if to reach for a weapon. Lozano asked Benaga where he could find some tacos. Benaga directed him to another restaurant. Lozano and Thomas started to walk away and then Lozano drew his service weapon, a chrome-finished 9 millimeter semi-automatic, placing it to Benaga's neck. Lozano then identified himself as a police officer and performed a pat-down search. Seeing out of the corner of his eye that José was approaching, Lozano called out for Thomas to help him. Thomas threw José up against a wall and searched him. Lozano put away his weapon when he found that Benaga was not armed. Benaga did not believe that Lozano was a police officer, so Lozano showed Benaga his badge. After a brief argument with Benaga and José, Lozano and Thomas left.

Lozano went home after dropping off Thomas. He parked his car in an alley near his apartment building and started walking back toward Tito's Hacienda. Soon afterward, two police officers, James Flores and Robert Poremba, pulled up beside him in an unmarked car. Poremba asked Lozano what he was doing. Lozano showed his badge and identification. Lozano asked if they had caught the people who had smashed his windshield. They told him that they did not know anything about that. Lozano said, "This is stupid, I'm going to go home."

Lozano testified that he went home and went to bed. An hour or two later, there was a knock at his door. When he opened the door, about six police officers, led by police sergeant William Dunn, entered without asking permission. Some of the officers started searching the apartment. Lozano asked what was going on but received no answer. Lozano then asked for everybody to leave except Sergeant Dunn. Dunn responded that he was the one in charge and pointed to the sergeant's stripes on his uniform. Dunn then ordered Lozano to come with them to the station. Officers took Lozano's badge, handgun and a pellet gun, all items that were lying on the kitchen table.

José and Benaga testified that, although they were standing near each other outside the restaurant on the night of the robbery, they did not know each other. Lozano and Thomas came up to them and Lozano asked where they could get some tacos. Benaga told them that Tito's was open. Lozano and Thomas started toward the restaurant, but

then Lozano spun around, pulled out a chrome-finished handgun and put it to Benaga's neck. He searched Benaga but did not find anything. Thomas threw José up against a wall. Lozano said that he was a police officer and displayed his badge. Thomas took out José's wallet and removed about $70. José asked him "Why are you taking my money?" Lozano started back toward the car and Thomas followed him, counting the money. Thomas went back briefly and gave José a few dollars "for the bus." A bystander, Joel Campos, said "They're not police officers. Write down their plate number." Campos wrote down the number and called the police. Later, José and Benaga went to the police station and identified Lozano in a lineup.

Campos testified that as Thomas and Lozano walked away after giving José the bus money they were laughing and Lozano said "gracias." Campos made a tentative identification of Lozano at the police station, but admitted that he was not positive he was correct.

Officer Poremba testified that he and his partner, Officer Flores, were patrolling in their unmarked car when they received a call about an armed robbery in the area of Tito's Hacienda. A physical description of the suspects was provided, along with a description of their car and the license plate number. According to the report, one of the offenders had claimed to be a police officer. Poremba and Flores noticed Lozano walking near the scene of the robbery and asked him what he was doing. Lozano said he was a police officer and showed identification. The officers noticed that Lozano matched the description of one of the robbers and that he was wearing police uniform pants and shoes.

After Lozano started back to his apartment, Flores and Poremba exited their car and followed him on foot. Outside the building they saw a car that matched the description of the one used by the robbers and had the same license plate number. They checked the number and found that the car was registered to a police officer named Mark Lozano. At that point they called their supervisor, Sergeant Robert Stasch.

Stasch testified that he met up with Flores and Poremba outside the apartment building. Stasch told them that he knew Lozano and knew him to reside at that address in the second-floor rear apartment. Another sergeant, Sergeant William Dunn, then arrived. After a brief conversation with the watch commander, they decided to talk to Lozano. The entrance to the building was unlocked. They entered. One of the officers knocked on the door of the second-floor rear apartment. Lozano answered the door, wearing boxer shorts and a T-shirt. Dunn asked him if he was Mark Lozano and if the car in the alley was his. Lozano answered yes.

Stasch approached the door and said "Mark, I'm Sergeant Stasch from the 12th district. Do you remember me?" Lozano replied "Yes, Sergeant. What's up?" Stasch told him that they had received a report of a problem outside the restaurant. He asked if Lozano had had a problem with two Hispanic men there. Lozano said that some gang members had thrown a rock at his car. Stasch asked if they could come in to find out what had happened and "straighten things out." Lozano stepped aside to let the officers in. The officers entered the apartment.

In the conversation that followed, Stasch told Lozano that there had been an allegation that he had drawn his handgun and taken some money from the men in front of the restaurant. Lozano denied having done so. Stasch asked if he could come to the station. Lozano asked if he could get dressed. Stasch said yes. After Lozano was dressed, they left. The officers took Lozano's badge, his service weapon and a pellet gun, which were all lying on a table near the door. Later, at the station, the victims picked Lozano out of a lineup. He was formally placed under arrest.

Lozano and Thomas were charged by indictment with the armed robbery of José and the attempted armed robbery of Benaga. The grand jury also charged Lozano with two counts of official misconduct, predicated on the armed robbery and attempt (armed robbery), respectively. Lozano and Thomas were tried separately.

Lozano filed a motion to quash arrest and suppress evidence. He argued that the seizure of his handgun and badge was the product of an illegal, warrantless search of his residence. He also argued that the police arrested him at his apartment and that they did not have probable cause to do so without the illegally seized evidence. The trial court denied the motions, crediting the police officers' testimony that Lozano had given consent for them to enter his apartment and that the badge and gun were in plain view once they were inside. The judge conceded that Lozano may have been under arrest at his apartment, but ruled that the police had probable cause to arrest him there.

Lozano testified in his own defense, contending that he had been acting properly as a police officer when drawing his weapon, searching Benaga and enlisting Thomas' aid in searching José. On cross-examination, the prosecution, over objection, elicited that Thomas had a felony conviction and that there was a police department regulation prohibiting officers from associating with known felons.

The jury convicted Lozano of the armed robbery of José and the count of official misconduct based on the armed robbery. However, it acquitted him of the attempted armed robbery of Benaga and the count of official misconduct based on the attempt.

Lozano now appeals, arguing that: (1) the trial court erred in denying his motions to suppress evidence and quash arrest; (2) the trial court erred in allowing the prosecution to raise Thomas' felony conviction and the department rule against associating with felons; and (3) the verdicts returned by the jury cannot stand because they are inconsistent.

ANALYSIS

I

Lozano first contends that the trial court erred in finding that the police had a right to enter his apartment without a warrant. According to Lozano, the police entered without asking permission. The State's witnesses, however, testified that they asked permission to enter and that Lozano freely gave his consent by opening the door and stepping aside. The trial court accepted the State's version of events. It is the province of the trial court to resolve conflicting testimony and assess the credibility of witnesses. *People v. Jones*, 184 Ill. App. 3d 412, 427, 541 N.E.2d 132, 141 (1989). As the court's factual findings were not against the manifest weight of the evidence, we do not disturb them. *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 364, 643 N.E.2d 1206, 1214 (1994).

■ One may waive the fourth amendment protection against unreasonable searches by consenting to a search. *People v. Stewart*, 10 Ill. App. 3d 187, 189, 293 N.E.2d 169, 171 (1973). When the trial court is faced with conflicting testimony, its determination that a suspect in fact manifested consent will be upheld unless clearly unreasonable. *Stewart*, 10 Ill. App. 3d at 189, 293 N.E.2d at 171. In this case, the officers testified that they asked Lozano if they could come in. Lozano responded by opening the door and standing aside. Consent to search may be manifested by conduct, as opposed to words. *In re M.N.*, 268 Ill. App. 3d 893, 897, 645 N.E.2d 499, 503 (1994). Moreover, it was reasonable for the police to interpret Lozano's conduct as consent to enter. *People v. Henderson*, 142 Ill. 2d 258, 299, 568 N.E.2d 1234, 1253 (1990), *declined to follow on other grounds by People v. Terry*, 183 Ill. 2d 298, 700 N.E.2d 992 (1998); *People v. Petersen*, 110 Ill. App. 3d 647, 654, 442 N.E.2d 942, 947 (1982).

Whether the manifestation of consent was voluntary is a factual determination made based on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 862-63, 93 S. Ct. 2041, 2047-48 (1973). The burden is on the prosecution to show that consent was freely given. *People v. Gross*, 166 Ill. App. 3d 413, 423, 519 N.E.2d 1043, 1051 (1988). A trial court's ruling on this

issue will only be set aside if clearly erroneous. *Gross*, 166 Ill. App. 3d at 423, 519 N.E.2d at 1051.

■ We believe the trial court correctly determined that, in view of the totality of the circumstances, the consent was voluntary. Lozano claims that he was forced to acquiesce in the search and questioning by Dunn's invocation of his authority as a sergeant. It is true that the prosecution must show that a purported consent was more than acquiescence to a claim of lawful authority. *Jones*, 184 Ill. App. 3d at 427, 541 N.E.2d at 141. Thus, the fact that the person who requested entry was Lozano's superior at work may be a relevant consideration in determining whether consent was voluntary. However, according to the version of events put forward by the officers, the sergeants did nothing to exploit their rank in order to make Lozano submit to a search. The trial court chose to believe the State's witnesses. Accordingly, under the totality of the circumstances, the consent was voluntary. The entry was not violative of Lozano's rights.

■ Since the entry was lawful, the seizure of the badge and gun was permissible under the "plain view" doctrine. Seizure of evidence in plain view is permissible if: (1) the officer did not violate the fourth amendment in arriving at the place from which the evidence could be plainly viewed; (2) the incriminating nature of the evidence was immediately apparent; and (3) the officer had lawful access to the items. *Horton v. California*, 496 U.S. 128, 136-37, 110 L. Ed. 2d 112, 123, 110 S. Ct. 2301, 2308 (1990). In this case, we have determined that the police had a lawful right to be in the apartment and thus could view the evidence and gain access to it. Lozano has not denied that the items were in the officers' plain view on his kitchen table. As the victims had reported that the robber matching Lozano's description had a badge and a silver-colored handgun, the incriminating nature of the items seized was immediately apparent.

■ Lozano also contends that he was improperly arrested in his apartment. At the hearing on the motion to quash arrest, the State argued that arrest did not occur until after Lozano had been picked out of a lineup by the victims. However, the trial court found that even if the arrest had taken place at Lozano's apartment, the arrest was still proper. We agree. The police may arrest a person in his or her residence if the person has consented for them to be there and the police have probable cause. *People v. Bean*, 84 Ill. 2d 64, 69, 417 N.E.2d 608, 611 (1981). The probable cause requirement is satisfied when the police possess sufficient information to lead a reasonable person to believe that a crime has been committed and that the defendant committed it. *People v. Gaston*, 259 Ill. App. 3d 869, 874, 631 N.E.2d 311, 315 (1994). Accepting the factual findings of the court below as not

manifestly erroneous, we review *de novo* the ultimate determination of whether these facts were sufficient to provide probable cause. *People v. Mabry*, 304 Ill. App. 3d 61, 64, 710 N.E.2d 454, 456 (1999); *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). Here, Lozano matched the physical description of one of the robbers, he had a handgun and badge similar to those used by one of the robbers, and he admitted ownership of the car allegedly used by the robbers. These circumstances were sufficient to give the police probable cause to make the arrest. Accordingly, the motion to quash was properly denied.

## II

■ Lozano also contends that his convictions must be reversed because the jury's verdicts were fatally inconsistent. Verdicts are reversible for inconsistency if they necessarily involve the conclusion that the same essential elements of the crimes in question both existed and did not exist. *People v. Murray*, 34 Ill. App. 3d 521, 531, 340 N.E.2d 186, 193 (1975). It is not enough that the jury convict and acquit of crimes arising out of the same set of facts. *People v. Klingenberg*, 172 Ill. 2d 270, 274, 665 N.E.2d 1370, 1373 (1996).

■ Lozano was charged with attempted armed robbery of Benaga (Benaga had nothing to steal) and the armed robbery of José (under an accountability theory). Intent is an essential element of both attempt (armed robbery) and accountability for armed robbery. 720 ILCS 5/18—1, 5—1 (West 1996). Thus, Lozano argues, the jury's verdicts convicting him of armed robbery and acquitting him of attempted armed robbery imply that he both did and did not have intent to steal. This argument is not persuasive. The crimes as charged were directed at different victims. See *People v. Thurman*, 169 Ill. App. 3d 996, 1005, 523 N.E.2d 1184, 1190 (1988). For one crime the relevant intent was the intent to take property from Benaga. For the other crime the relevant intent was the intent to help Thomas take money from José. The nonexistence of one of these mental states does not necessarily imply the nonexistence of the other. The jury concluded that the State had not proven that Lozano intended to rob Benaga, but had proven that he intended to help Thomas rob José. The findings are not fatally inconsistent.

From this conclusion, it also follows that the conviction and acquittal on the counts of official misconduct based on the armed robbery and attempt (armed robbery), respectively, must stand.

## III

■ Finally, Lozano contends that the trial court abused its discretion in allowing the prosecution to elicit on cross-examination that

Thomas had a felony conviction and that there was a police regulation forbidding officers to associate with known felons. The State maintains that this was permissible impeachment to rebut Lozano's implication that he had a right to call upon Thomas to aid him in performing an arrest.

Police officers are permitted by statute to call upon others for aid in making an arrest.

> "107—8. Assisting peace officer. (a) A peace officer making a lawful arrest may command the aid of persons over the age of 18.
>
> (b) A person commanded to aid a peace officer shall have the same authority to arrest as that peace officer.
>
> (c) A person commanded to aid a peace officer shall not be civilly liable for any reasonable conduct in aid of the officer." 725 ILCS 5/107—8 (West 1996).

The defense theory had Lozano calling out to Thomas to search José not in order to rob him, but in order to help Lozano safely effectuate an arrest. The State maintained that it could ask Lozano about the regulation and Thomas' felony conviction in order to show that it was not proper for Lozano to ask Thomas' aid in making an arrest. The trial court accepted this rationale.

> "Now the State has asked to ask if the witness was aware of departmental regulations not to associate with people known to be convicted felons. *** The Court finds that it's relevant because he did assert as part of his defense that he felt he had a right to ask Thomas Gonzales to assist him with these activities so that objection will be overruled."

The latitude to be allowed on cross-examination is within the discretion of the trial court. *People v. Collins*, 106 Ill. 2d 237, 269, 478 N.E.2d 267, 281 (1985). Moreover, a trial court's ruling regarding cross-examination will not be disturbed absent manifest prejudice to the defendant. *Collins*, 106 Ill. 2d at 269, 478 N.E.2d at 281. It can be argued in this case that, in view of the statute, the police regulation would not have prohibited Lozano from requesting the aid of a known felon in making an arrest if he believed himself to be in danger. However, while the relevance of the line of cross-examination allowed by the court becomes a disputable issue, under the case law we cannot say that the trial court abused its discretion in finding as it did. In reviewing for an abuse of discretion, "[t]he question is not whether the appellate court agrees with the circuit court but whether the circuit court acted arbitrarily, without employing conscientious judgment, or whether in view of all of the circumstances the court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." *Moffitt v. Illinois Power Co.*, 248 Ill. App. 3d 752, 758, 618 N.E.2d 1305, 1309 (1993).

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

O'MARA FROSSARD and GALLAGHER, JJ., concur.